238 P.2d 945

**LEE v. SALT RIVER VALLEY WATER USERS' ASS'N.**

**LEE v. SALT RIVER VALLEY WATER USERS' ASS'N.**

**No. 5403.**

Supreme Court of Arizona.

Dec. 17, 1951.

Robert & Price, Phoenix, for appellant.
Jennings, Strouss, Salmon & Trask, J. A.
Riggins, Jr. and Rex H. Moore, Phoenix,
for appellee.

PHELPS, Justice.

This is an appeal from an order granting appellee's motion for judgment notwithstanding the verdict and from the judgment entered thereon.

The facts are that Robert Jennings Lee, the minor son of appellant Alvira Lee, was injured by coming in contact with a high-voltage electric wire alleged to have been owned and maintained by appellee.

Two causes of action were instituted against the Salt River Valley Water Users: one on behalf of the mother, Alvira Lee,

for medical and hospital expenses incurred by her on behalf of her minor son, and the other by Robert Jennings Lee by his guardian ad litem, Alvira Lee, for injuries sustained by him. Thereafter these causes of action were consolidated for trial and such other proceedings as might arise thereon.

The complaint alleges in substance that appellee at all times mentioned therein, maintained a pole line in the vicinity of 16th Street and East Indian School Road carrying 26,000 volts of electricity; that this line was connected with a pump house approximately 10 feet above the ground; that children were accustomed to congregate and play around the pump house and use the large water trough (wier) as a swimming pool; that the pole line was maintained in a careless, negligent and reckless manner and with no provisions to safeguard and prevent children from climbing upon the pump house owned by defendant, or to advise them of the danger thereof, all of which was known to appellee.

It further alleges than on the 2nd day of July, 1949, the minor son whom we shall hereafter refer to as Robert, age 11, while playing with other children in the vicinity of the pump house not knowing the danger thereof and not knowing that the pole line was a high-power line or dangerous, climbed from the ground to the top of the pump house, seized the wire on the said pole maintained by the Water Users, receiving a severe electric shock to such an extent that he was knocked from the pump house to the ground, thereby suffering great injuries, described in particular in the complaint; that large expenses were incurred in medical and hospital care, and prayed for judgment on behalf of the mother for the expenses incurred and for judgment on behalf of Robert for the injuries he sustained.

Appellee interposed the defense, first, that the complaint failed to state a cause upon which relief could be granted; secondly, it admitted it maintained the pole line but denied that it carried 26,000 volts of electricity. It denied ownership of the pump house and denied that it was guilty of negligence in any manner; third, alleged that any damage suffered by plaintiffs was due to the sole negligence of Robert; and fourth, if damages were suffered by plaintiffs, it was due to the contributory negligence of both the mother and Robert.

These issues were submitted to a jury and a verdict was returned in favor of the mother for the sum of $410 and in favor of Robert for $5,000. Upon motion of plaintiffs, judgment was entered thereon. The trial court thereafter granted appellee's motion for judgment notwithstanding the verdict, vacated the former judgment in favor of appellants, and entered judgment in favor of appellee.

Appellants have assigned as error that the trial court erred in arriving at the following conclusions:

(a) That there was no evidence in the record upon which the jury could find the appellee owned, operated or maintained the property on which Robert was injured;

(b) That Robert being a trespasser and not a mere invitee or licensee was deprived of his right to judgment;

(c) That being a trespasser it was necessary for him to prove wilful, wanton and intentional injury on the part of appellee in order to entitle him to recover a judgment against it;

(d) That there was no evidence that the object appellant claimed caused the injury to Robert attracted him to the place in question;

(e) That even if the court did consider the transformer to be an attractive nuisance and lured Robert upon the property there was no evidence from which the jury could find that reasonable and necessary precautions were not taken by appellee to protect anyone upon the property from injury.

There is no evidence in the record to indicate what relation the Salt River Power Project bears to the Salt River Valley Water Users' Association and it is not a matter of common knowledge as suggested in appellants' brief but we will assume for the purpose of this decision that appellee is the owner of the pump house and the transformer and will proceed to a discussion of the other conclusions of the trial court assigned as error.

If Robert was a trespasser upon the property the trial court was correct in holding that in order for him to recover, he must produce evidence that appellee wilfully, wantonly and intentionally inflicted injuries upon him, unless the evidence further showed that he was tempted to trespass upon such premises by something located thereon of unusual character, of more than ordinary attraction and easily accessible to him; in other words unless the evidence showed that at the time the injury occurred appellee was maintaining an attractive nuisance upon the premises. If it was, then under the attractive nuisance doctrine it owed Robert the duty to exercise that care and precaution in protecting him from injury as an ordinary prudent person would have exercised under similar circumstances. Did appellee maintain an attractive nuisance?

It will be observed that the complaint alleges merely that " * * * At all times hereinafter mentioned and for a long period prior thereto children were accustomed to congregate and play around the said pump house and use a large water trough attached thereto as a swimming pool. * * *"

This allegation was inadequate to bring the cause of action within the attractive nuisance doctrine. In 38 Am.Jur., Negligence, Sec. 272, it is stated: " * * * It is essential that the plaintiff allege that the person injured was led to the place of in-

jury by its attraction or allege the attraction of the instrumentality which caused the mischief. In an action for an injury to a trespassing child it is not enough, as the rule is laid down by some courts, in order to state a cause of action under the doctrine of the 'Turntable Cases [Sioux City & P. R. Co. v. Stout, 17 Wall. 657, 21 L.Ed. 745],' to allege that the premises were attractive to children or that children generally were attracted thereto; the pleadings must show that the attraction lured the particular child there with the resulting injury. * * *"

In the case of Fusselman v. Yellowstone Valley Land & Irrigation Co., 53 Mont. 254, 163 P. 473, 476, the court said: "It is a general rule of pleading in actions for damages for injuries received upon the defendant's property that the complaint must disclose by what right the injured party was upon the premises. * * * 29 Cyc. 567. In failing to allege that Birdena Fusselman was attracted to the canal or that by reason of its peculiar attractiveness she went upon the canal and met her death, the complaint fails to state a cause of action under the doctrine of the turntable cases."

The complaint in the Fusselman case, supra, merely alleged that the children of the neighborhood were accustomed to play along the canal and on unoccupied lots along or near the canal.

Again, however, for the purpose of considering other questions raised by appellant, let us assume that the complaint stated a cause of action. The most that we can in-fer is that children were attracted there by the water trough (wier) and the pump house. It has been the law in this state since the case of Salladay v. Old Dominion Copper Mining & Smelting Co., 12 Ariz. 124, 100 P. 441, decided in 1909, that the turntable doctrine would not be extended to canals especially when the very lifeblood of our economic stability rested upon the irrigation of our arid lands. Certainly there can be no distinction between the maintenance of a wier at pumps for the purpose of measuring water to be used for irrigation purposes and the maintenance of canals for the purpose of conveying the water from the pumping plants to the lands upon which it is applied.

This leaves only the pump house for our consideration. The question then presents itself, is there anything about a pump house that is unusual that would make it attractive to children? Is there anything about it that distinguishes it from any other small house, unless it be the framework extending from the roof upward 20 to 25 feet? There is nothing within the pleadings or the proof to the effect that children were attracted by this framework on top of the pump house and there is no evidence that any of the children ever climbed over the framework. The only evidence in the record concerning this is that Victor Stewart, uncle of Robert, was sitting on the lower crosspiece of the frame when Robert came in contact with the electric current. The only use made of the pump house ap-

parently was to climb over it and lie in the sun to dry after swimming in the trough.

To hold that a pump house standing alone constitutes an attractive nuisance would require home owners to barricade their garages and other outbuildings against children who may desire to climb over and play upon them. In order to constitute a thing an attractive nuisance it must be of unusual attraction not merely an ordinary thing. Hayko v. Colorado & Utah Coal Co., 77 Colo. 143, 235 P. 373, 39 A.L.R. 482. But contrary to the allegation of the complaint the pump house was in nowise responsible for Robert's injury. Insofar as the record discloses, Robert was not on the pump house at all at the time of the injury. He climbed up the power line pole to the transformer the bottom of which was approximately 8½ feet from the ground and the top thereof appears from the map measurements to be around 13 feet from the ground. The eave of the pump house was 10¼ feet above the ground and 2 feet, 5 inches from the pole. All electric wires leading from the transformer to the pump house were enclosed in conduits. These conduits were wrapped with barbed wire as a further precaution against injury. While there is no direct evidence in the record as to the distance from the top of the pump house to the cable carrying the 12,000 volts of electricity into the transformers, the map measurements according to the scale would indicate that the cable could not be contacted by a child or even a man from the top of the pump house. Neither does the evidence disclose that there was any other exposed wire carrying an electric current which could be contacted from the top of the pump house.

Thus it will be seen that even if the pump house were held to be an attractive nuisance, it was not even remotely responsible for the injury suffered by Robert. The instrumentality, the transformer which caused the injury, was neither alleged nor proved to have attracted Robert or to have been instrumental in causing him to go upon the premises or to climb the power pole. The testimony is not in conflict on the subject but is all to the effect that at the time of the injury he climbed the power line pole, not out of curiosity concerning the mechanism or functioning of the transformers, but he climbed it to evade being caught by a playmate who was "it" in a game of tag.

After stating he had climbed up the pole on a previous occasion Robert admitted, on cross-examination, that he had stated in his deposition taken prior to the trial that he had never been up the pole before and he had never been on the transformer before. He also admitted upon the witness stand that he knew that it was dangerous to climb up to the transformer. His testimony upon these matters was as follows:

"Q. And you knew that transformer was dangerous, didn't you? A. Well, I didn't —I knew it was dangerous, but golly any-

body would get up there; that was a good place to play and everything. You couldn't help from going up there."

And on direct examination he was asked:

"Q. Did you know they were high-power wires? A. Well, I knew I might get shocked or something if I went up there, but it was so *attractive* to *kids,* you forgot all about it." (Emphasis. supplied.)

With respect to this matter he was asked:

"Q. Did you ever step over on this transformer any other time before the day you were hurt, referring to Defendant's 3 in Evidence? A. Yes, I believe I have climbed up there before."

However, on cross-examination he was asked:

"Q. Bobby, maybe I misunderstood you, but I thought you testified that you generally got up on this—you had been up on the transformer pole several times before. Referring to Plaintiffs' A in Evidence, do I understand you to say that your usual way of getting on the roof was climbing on this pole and over to the roof? A. Yes, but I never did get on the transformer but that once.

"Q. About how many times did you come up this way? A. About four or five, I guess. More than I did the other way.

"Q. More than you did the other way? A. Yes.

"Q. And you say you were never on the transformer, or you had been there be-fore? A. No, I never was on there before.

"Q. Bobby, do you remember when I took your deposition in my office? A. Yes.

"Q. Do you remember having been asked these questions, and making these answers; page twelve:

" 'Q. And could you climb up on the transformer, Bobby, without getting on to the pump house? A. No, I don't think I could.

"Q. Did you ever do it? A. No, I never was on the transformer, I just got on that pump.

"Q. And you never climbed up between those wires, the barbed wires? A. One time I climbed up on the far side where the pole is, on that side of it.

"Q. The east transformer poles, is that right? A. Yes.' "

"Q. Did you make those answers to those questions? A. Yes, I think so."

In the light of the above facts we conclude that the trial court did not err in ruling that Robert was a trespasser at the time of his injury and that he could only recover against appellee by showing that he was injured as a result of the wilful, wanton and intentional conduct of appellee.

■ In the instant case appellee brought the electric current consisting of 12,000 volts into the top of the transformer, con-

ducted through a cable consisting of wires twisted together. The map measurement would indicate that the transformers are approximately 3½ feet high and are 2 feet 5 inches from the eave of the pump house. The wire leading from the transformer to the pump house carrying 440 volts was conducted through a conduit so that there was no exposure thereof accessible to any one from the top of the pump house. The evidence further disclosed that the transformer was quite heavily barricaded with barb wire extending around it running parallel with the beams on which the transformer sat beginning near the base of the transformer and extending well up toward the top thereof. There was reference made in the evidence to measurements of the height of this barbed wire barricade but the measurement did not get into the record. There are also angle iron extensions parallel to and at right angles with the pump house extending from the base of the transformer which were likewise covered with barbed wire entanglements. All of this tended to make access to the transformer more difficult. Frankly we do not see that much more could have been done to protect against injury by any one trespassing thereon. We feel that to require more than was done by appellee would impose the responsibility of an insurer upon property owners.

The order and judgment of the trial court, notwithstanding the verdict, is affirmed.

UDALL, C. J., and STANFORD, DE CONCINI and LA PRADE, JJ., concur.