578 P.2d 177

**Thomas HARRIS for and on behalf of himself and Hallie Harris, his wife, Appellant,**

**v.**

**BUCKEYE IRRIGATION COMPANY and the Buckeye Water Conservation and Drainage District, a political subdivision, Appellees.**

No. 13570.

Supreme Court of Arizona, In Banc.

April 24, 1978.

Treon, Warnicke, Dann & Roush, P. A. by Richard T. Treon, Andrews, Marenda & Moseley, P. A. by William S. Andrews, Dennis P. Turnage, Phoenix, for appellant.

Jennings, Strouss & Salmon by Michael A. Beale, Phoenix, for appellees.

CAMERON, Chief Justice.

This is an appeal by the plaintiff from the granting of a motion for summary judgment. Defendant had moved for dismissal pursuant to Rule 12(b)(6) of the Rules of Civil Procedure, 16 A.R.S., and the trial court treated the motion as a motion for summary judgment pursuant to Rule 56 of the Rules.

We must answer only one question on appeal: Does the previous case of *Salladay v. Old Dominion Copper Mining Co.*, 12 Ariz. 124, 100 P. 441 (1909) and cases following, apply to the negligent construction and maintenance of a bridge over an irrigation canal by an irrigation company?

Viewing the facts and all reasonable inferences to be drawn therefrom in a light most favorable to the party against whom the motion was granted, *Livingston v. Citizen's Utility, Inc.*, 107 Ariz. 63, 481 P.2d 855 (1971); *Serna v. Statewide Contractors, Inc.*, 6 Ariz.App. 12, 429 P.2d 504 (1967), the following is necessary for a determination of this matter. The defendants, Buckeye Irrigation Company and the Buckeye Water Conservation and Drainage District, maintain an irrigation ditch near the town of Buckeye, Arizona. The ditch runs east to west. The north side of the ditch borders on a Southern Pacific Railroad right-of-way and some privately owned farm land. North of this area is a settlement of some 550 to 750 people, many with school age children. To the south of the canal is the Buckeye Union High School grounds and next to it is a Little League baseball field and a public swimming pool.

At a point near the end zone of the Buckeye Union High School football field is a checkpoint in the irrigation system. This checkpoint consists of two concrete slabs or pillars on each side of the irrigation ditch and one pillar or slab in the middle. Whenever it is desired to raise the water level upstream for irrigation purposes, boards are inserted between the slabs to check the flow of water at that point. To provide a method for employees of the irrigation district to insert boards into the slot at the checkpoint, four boards have been placed on the concrete pillar, two on each side, and nailed together in the middle by a fifth short board. The bridge is then two boards wide and though the record does not indicate the size of the boards, pictures before this court and the statement of counsel at oral argument indicate that they are not more than 12 inches wide so that the bridge is no more than 24 inches wide.

Children and adults living in the Valencia area have long used this footbridge to and from the high school, the Little League field, and the swimming pool. There is a municipal construction and maintenance bridge crossing the canal located 400 yards to the east of the checkpoint and another crossing a quarter of a mile to the west of the checkpoint.

There was testimony that prior to the accident in question, there had been at least one drowning at the same bridge and that four months before there had been a near drowning which had been brought to the attention of the defendants. The deposition testimony of the Principal of the Buckeye Union High School was as follows:

"Q And have you had some concern about the children using that check point, Mr. McNabb?

"A Yes, almost from the first school year, 1959, and my main concern has been that it's the only crossing between Fourth Street and what I have called Apache Road, which is adjacent to the Gulf station. There is a road that used to cross the canal there, and this means that the students have to walk anywhere from a quarter to a half mile to gain a crossing."

The Principal also testified that he had attempted to make the crossing safer:

"Q Did you ever say to Mr. Weigold [the manager of the irrigation company]: We would like to have a better crossing to protect the children.

"A This was part of my conversation. I proposed—and this is the proposal: that we had some old Salt River power poles, steel braced, very heavy, and they were long enough to span the canal, and I could visualize that we could use these steel posts, embed them in concrete and have the shop and welding students put railings on them, and it would be a safe and also a good crossing. But they saw fit not to do so.

"Q Have you ever indicated to Mr. Weigold in conversation to him that you

felt that the check point—the Buckeye Union High School check point right north of the athletic field was dangerous for the children to use?

"A  Well, that would be a matter of opinion.  In my opinion, I could cross it the rest of my life, perhaps, and never be in danger.  If people are going to cross it with bicycles or motorcycles or horses, or if they have vertigo or any of that type of thing, or if they are too young or unstable or drunk, it would be unsafe.

"Q  Have you ever indicated or expressed this to Mr. Weigold in those conversations?

"A  I have indicated it, I'm sure, in my talking about the reasons why we wanted to move the location."

The Principal also testified as to the use of the bridge:

"Q  Mr. McNabb, let me ask you something about the use of the structure during the summer months when they have the Little League.  I understand that Little League games are played just to the south of the high school property in the park over there.

"A  That's right.

"Q  And there is a swimming pool?

"A  That's right.

"Q  In the summertime, younger children, let's say grade school age use that structure more in the summer than they do in the winter—

"MR. BEALE:  I object to the form.

"THE WITNESS:  Well, I would estimate there is not too much difference in the amount of traffic.  The school activities attract them during the wintertime, and recreation and the swimming pool and downtown attract them all year around.  I would estimate probably about the same amount of traffic."

The Principal estimated that 100 to 200 people a day used the bridge.

The attitude of the defendants can best be shown by the following deposition of the manager of the district, Wilbur W. Weigold,

concerning a near drowning four months prior to the death of the Harris boy:

"Q  Do you know Mrs. Tilley, the mother of the boy that fell in there?

"A  No, sir.

"Q  Never met her?

"A  No, sir.

"Q  Just talked to her on the phone?

"A  I assume that is the name.  I don't even recall the name of the woman that called me.

"Q  Did she identify herself when she called?

"A  I suppose she did.  I don't recall.

"Q  And after she did call, you did know that her boy had fallen into the canal?

"A  No; I did not know it.

"Q  Well, she told you he did, didn't she?

"A  That doesn't mean he fell.

"Q  I mean she did tell you that he had fallen in?

"A  Well, now, he could have fallen in or he could have gotten in the canal by himself.  I have no way of knowing those things.

"Q  My question is:  Did she tell you that he fell in the canal?

"A  Yes.

"Q  And did she express some real concern over this structure or facility?

"A  I would say probably she did or she wouldn't have called me.

"Q  And after she called you, did you consider or make—take any steps to make the structure—modify the structure?

"A  No, sir.

"Q  Why?

"A  Because it is the obligation of the parents to keep the kids off of this property and keep them off the property adjoining it on the north and the property adjoining it on the south, which is all private property.  They have to trespass from up to the north across the railroad tracks on private property to get to this particular point.  When they leave this

point, they are on private property and they are trespassing on that if they go on to the high school or to our property or anybody else's property.

\* \* \* \* \* \*

"Q Well, that's your duty to see that the facility is safe for anybody that might use it, isn't that correct?

"A No, it isn't.

\* \* \* \* \* \*

"A It's not my responsibility to see that everything on our canal system is safe for anybody's use.

"Q Well, what to you feel your responsibility is?

"A My responsibility is to the employees of that company that might use it.

"Q Nobody else?

"A No; I don't believe it is."

The pleadings allege that on 19 June 1975, Marlon L. Harris, age 12, while on his way to the Little League baseball park on his bicycle, fell off the bridge. The bicycle was found in the canal near the checkpoint and the body of Marlon L. Harris was found some two miles downstream from the bridge.

Suit was brought by the parents of the deceased. The defendants moved to dismiss and the court, based upon the affidavits and depositions filed in the case, treated the motion as a motion for summary judgment. The court granted the motion and the plaintiff appeals.

Because of the need for water in an arid land, irrigation companies in Arizona have long been favored with immunity from suits for attractive nuisance:

"\* \* \* It is a matter of common knowledge that alluring and attractive flumes, such as the one in question in this case, carrying running water, are extensively used in this territory, not only by miners in the necessary and proper conduct of their business, but by farmers in the necessary diversion and application of the public streams to a beneficial use upon their lands in the cultivation of their crops. Not only flumes, but irriga-tion ditches, large and small, similar in purpose, construction, and use, and equally dangerous and alluring to the child, are to be found throughout the territory wherever cultivation of the land is carried on, and such conduits, practically impossible to render harmless, are indispensable for the maintenance of life and prosperity. There is no distinction that properly can be drawn for liability for injuries received by a child from any of such various means of diversion or use of water. Both as a matter of law and as a matter of public policy we feel that the so-called 'turntable doctrine' should not be extended to cover such a case as is here presented." *Salladay v. Old Dominion Copper Mining Company*, supra, 12 Ariz. at 129–30, 100 P. at 442.

And:

"This court has built upon and extended the *Salladay* decision to provide almost complete immunity to irrigation districts in Arizona in the maintenance not only of the canals and diversion points, but also various mechanical and electrical equipment needed to operate the water distribution system. \* \* \*" *Dombrowski v. Maricopa Co. Mun. Wat. Cons. Dist.*, 108 Ariz. 275, 276, 496 P.2d 136, 137 (1972). See also *Lee v. Salt River Valley Water Users' Ass'n*, 73 Ariz. 122, 238 P.2d 945 (1951); *Downs v. Sulphur Springs Valley Electric Coop.*, 80 Ariz. 286, 297 P.2d 339 (1956); *City of Glendale v. Sutter*, 54 Ariz. 326, 95 P.2d 569 (1939).

We believe that the facts of the instant case can be distinguished from previous cases of this court and the Court of Appeals. In the instant case, the defendant placed a bridge at a point where it could be anticipated that the public would use it to cross the canal. Because of the location of the high school, the baseball field, and the swimming pool, it could reasonably be expected that children as well as adults would use this bridge. The defendant also had ample notice of the fact that the bridge was potentially dangerous. The bridge was, in fact, open to the public generally and the defendants did nothing either to restrict the

use of the bridge by the public or to make it safe for the persons they knew were using the bridge.

"We find the law to be that if an owner or occupant of property has permitted persons generally to use or establish a way across it under such circumstances as to induce a belief that it is public in character, he owes to persons availing themselves thereof the duty due to those who come upon the premises by invitation. (citation omitted)" *Olsen v. Macy,* 86 Ariz. 72, 74, 340 P.2d 985, 986–87 (1959). See also Prosser on Torts, 4th Ed., § 61 at pp. 388–89.

The immunity given to irrigation districts in *Salladay,* supra, was based in sound public policy at the time. It is sound public policy today as far as the use of canals and canal banks are concerned. Unfortunately, this immunity sometimes leads to the callous "public be damned" policy exemplified by the testimony of the manager of the defendant irrigation company in the instant case. The statement of the manager that it was "not my responsibility to see that everything on our canal system is safe for anybody's use" and that he is only concerned with the safety of his employees and not anyone else's, is the direct result of the belief by the irrigation company that because of *Salladay,* supra, it had absolute immunity from suit.

As this matter was decided on motion for summary judgment, all the facts were not developed. Assuming, however, that the judge or jury finds, after hearing all of the evidence at trial, that Marlon Harris fell from the bridge in question as the result of negligence on the part of the defendants or their employees in the building or maintenance of the bridge, we feel that under the peculiar facts of this case public policy does not require the application of the *Salladay* immunity doctrine. This, it seems, is the only way that the defendants and others in like situations can be prevented from using a grant of immunity as an excuse not to exercise reasonable care to protect the members of the public from a negligently constructed and maintained bridge they knew was being used by the public.

Reversed and remanded for further proceedings not inconsistent with this opinion.

HAYS, HOLOHAN, and GORDON, JJ., concur.

STRUCKMEYER, Vice Chief Justice, concurring.

I concur in the result.