823 P.2d 1264

Joseph K. BLEDSOE, a single
man, Petitioner,

v.

The Honorable Stanley Z. GOODFARB,
Judge of the Superior Court of the
State of Arizona, in and for the County
of Maricopa, Respondent,

and

SALT RIVER VALLEY WATER USERS
ASSOCIATION, an Arizona corporation,
Real Party in Interest.

SALT RIVER VALLEY WATER USERS
ASSOCIATION, Petitioner,

v.

The Honorable Stanley Z. GOODFARB,
Judge of the Superior Court of
Maricopa County, Respondent,

Joseph K. BLEDSOE, Real
Party in Interest.

Nos. CV–91–0122–SA, CV–91–0130–SA.

Supreme Court of Arizona.

Dec. 19, 1991.

Reconsideration Denied Feb. 19, 1992.

Hofmann, Salcito & Stevens, P.A. by Daniel R. Salcito, Leroy W. Hofmann, Phoenix, for Joseph K. Bledsoe.

Jennings, Strouss & Salmon by Michael A. Beale, James M. Ackerman, Mikel L. Moore, Phoenix, for Salt River Valley Water Users Ass'n.

Central Arizona Water Conservation Dist. by Douglas K. Miller, Suzanne K. Ticknor, Phoenix, for amicus curiae, Central Arizona Water Conservation Dist.

Ellis, Baker & Porter, P.C. by William D. Baker, Paul R. Orme, Phoenix, for amici curiae, Central Arizona Irr. & Drainage Dist., Maricopa–Stanfield Irr. & Drainage Dist., New Magma Irr. & Drainage Dist.

Martinez & Curtis, P.C. by Michael A. Curtis, Steven B. Bennett, Phoenix, for amici curiae, Cortaro–Marana Irr. Dist. Hohokam Irr. & Drainage Dist., San Tan Irr. Dist.

Bryce & Udall by Kenyon Udall, Safford, for amicus curiae, Gila Valley Irr. Dist.

Brown & Brown by David A. Brown, St. Johns, for amicus curiae, Lyman Water Co.

Riney B. Salmon, II, Phoenix, for amicus curiae, Maricopa County Mun. Water Conservation Dist. No. 1.

Westover Law Offices by Tom Choules, Yuma, for amici curiae, North Gila Valley Irr. Dist., Wellton–Mohawk Irr. & Drainage Dist., Yuma Irr. Dist.

Burch & Cracchiolo, P.A. by Daryl Manhart, Edwin C. Bull, Phoenix, for amicus curiae, Roosevelt Irr. Dist.

Ryley, Carlock & Applewhite, P.A. by Richard N. Morrison, Phoenix, for amicus curiae, Roosevelt Water Conservation Dist.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Ralph E. Hunsaker, Phoenix, for amicus curiae, Silver Creek Irr. Dist.

Suciu, Donovan & Schmitt by Larry W. Suciu, Yuma, for amici curiae Unit B Irr. & Drainage Dist., Yuma County Water Users' Ass'n.

A. James Clark, Yuma, for amicus curiae, Yuma Mesa Irr. and Drainage Dist.

Snell & Wilmer by Carlos D. Ronstadt, Phoenix, for amicus curiae, Harquahala Valley Irr. Dist.

## OPINION

FELDMAN, Vice Chief Justice.

Both plaintiff, Joseph K. Bledsoe (Bledsoe), and defendant, Salt River Valley Water Users Association (the Association), bring special action petitions to challenge the trial court's partial grant of a motion for summary judgment in a negligence action. The basic issues concern the tort immunity granted to landowners of recreational premises by A.R.S. § 33–1551 and to owners and operators of irrigation canals by the common law doctrine originating in *Salladay v. Old Dominion Copper Mining Co.*, 12 Ariz. 124, 100 P. 441 (1909).

The Association sought summary judgment, asserting that Bledsoe's negligence claim is barred by both A.R.S. § 33–1551 and *Salladay*. The trial judge granted the Association's motion in part, ruling that both the statute and the common law granted the Association qualified immunity, thereby barring Bledsoe's simple negligence action. However, the court refused to dismiss the case because it believed Bledsoe might present facts at trial demonstrating willful or malicious failure to guard or warn against a dangerous condition. Such a claim, the court held, would not be barred by the statute. Likewise, the court held that *Harris v. Buckeye Irrigation Co.*, 118 Ariz. 498, 578 P.2d 177 (1978), might limit *Salladay* and allow Bledsoe to pursue his claim if he could show the Association acted willfully, maliciously, or with reckless indifference or a "public-be-damned" attitude. Minute Order, March 5, 1991. Bledsoe and the Association both seek special action relief [1] pursuant to Rule 1(a), Ariz.R.P.Spec.Act., 17B A.R.S.

## SPECIAL ACTION JURISDICTION

■ Appeal after final judgment is generally the proper remedy for trial court errors in granting motions for summary judgment. We believe special actions challenging a trial court's denial of summary judgment motions are appropriate only under exceptional circumstances. *See Orme School v. Reeves*, 166 Ariz. 301, 302–03, 802 P.2d 1000, 1001–02 (1990).

■ Both parties argue that this case is such an exception to this jurisprudential policy because the issues have statewide significance: the extent and continued viability of the *Salladay* doctrine protecting owners and operators of irrigation canals from liability, and the interpretation of a recreational use statute never before considered by this court. Indeed, approximately twenty water districts, companies, and associations appear as amici in this case, urging us to accept jurisdiction of these issues affecting water organizations statewide.

We agree and accept jurisdiction of these special action petitions directly from the trial court to resolve the questions presented and provide guidance on these matters of public import. *See Kelley v. Arizona Dep't of Corrections*, 154 Ariz. 476, 477–78, 744 P.2d 3, 4–5 (1987); *Summerfield v. Superior Court*, 144 Ariz. 467, 469, 698 P.2d 712, 714 (1985). We have jurisdiction pursuant to article 6, § 5(3) of the Arizona Constitution and Rule 8, Ariz.R.P.Spec. Act., 17B A.R.S.

## STATEMENT OF FACTS

The Association was formed in 1903 to promote irrigation in the Phoenix area. The Association is a private corporation that operates and maintains irrigation canals throughout the valley. It presently operates over one thousand miles of canals and laterals (secondary canals conveying water to specific irrigated lands) in Maricopa County. Because of the tremendous population growth in Maricopa County, the land surrounding some of these canals and laterals is now urbanized and heavily populated.

The Association built and still maintains roadways on the banks of the canals and laterals, using them for maintenance and construction. In 1972, the Association entered into agreements with various government entities, including the City of Phoenix, to open the canal roads and banks to the public for recreational activities such as fishing, jogging, and bicycling. One such roadway runs adjacent to an Association lateral near 31st Avenue and Camelback Road, a major east-west artery within the Phoenix city limits.

In the early morning hours of April 5, 1989, Bledsoe rode his bicycle on the canal roadway near 31st Avenue and Camelback on his way to work at the Phoenix Fire Department Fitness Center. This was his first attempt at bicycling to work, and he had never travelled this route before. The Association maintained several "cable gates" across the canal roads along Bled-

---

1. In Arizona, relief formerly obtained by writs of prohibition, mandamus or certiorari is now obtained by "special action." Rule 1, Ariz. R.P.Spec.Act., 17B A.R.S.

soe's path to prevent access of unauthorized motor vehicles. A cable gate is an obstruction created by suspending a cable or chain across the canal road between posts anchored at each side. The cables were evidently marked by signs with reflective red and white stripes. Apparently not seeing one of the cables in the dark, Bledsoe ran into it at approximately 5:20 a.m. He was thrown from his bicycle and received severe injuries that caused quadriplegia.

Bledsoe subsequently sued the Association in Maricopa County Superior Court, alleging the Association was negligent in installing and maintaining the cable gate. The Association moved for summary judgment, claiming that A.R.S. § 33–1551 and the *Salladay* doctrine barred Bledsoe's claim. As noted, the trial judge partially granted the Association's motion, and both parties sought special action relief.

## DISCUSSION

The parties raise numerous arguments, but they may be distilled as follows. The Association urges that the recreational use statute, A.R.S. § 33–1551, provides it with complete immunity to Bledsoe's action. Bledsoe, on the other hand, claims the statute is inapplicable. If applicable at all, he argues, it confers immunity only for the Association's simple negligence, not for its willful or malicious failure to guard against a dangerous condition. The Association next argues that if the damage action can survive under the recreational use statute, then it is entitled to complete immunity under the *Salladay* doctrine. Bledsoe urges that the *Salladay* doctrine is inapplicable to this case or, if applicable, that it should be overruled or qualified. We turn first to an examination of the statute.

A. Does Arizona's recreational use statute give the Association immunity for an accident occurring on an improved canal road located in an urban community?

### 1. *Limits on applicability of the statute*

Many states have adopted recreational use statutes to reduce or eliminate the liability of property owners who open their lands to recreational users. There is a large body of case law interpreting those statutes. *See* 3 S. SPEISER, C. KRAUSE & W. GANNS, THE AMERICAN LAW OF TORTS § 14:5 (1986). These statutes generally are designed to alter the common law rules regarding landowner liability to invitees, licensees, and trespassers by narrowing or obviating the owner's duty of care toward recreational users. *See* Barrett, *Good Sports and Bad Lands: The Application of Washington's Recreational Use Statute Limiting Landowner Liability*, 53 WASH.L.REV. 1, 3–8 (1977). The legislative history of Arizona's statute provides additional evidence that our act was designed to encourage landowners to open certain lands to recreational users by limiting liability for injuries to those users.[2]

Arizona adopted its recreational use statute, A.R.S. § 33–1551, in 1983. It provides in pertinent part:

A. An owner ... of premises does not:

1. Owe any duty to a recreational user to keep the premises safe for such use.

2. Extend any assurance to a recreational user ... that the premises are safe for such entry or use.

---

2. Representative Jim Ratliff, a sponsor of the legislation, stated that it would promote use of vast areas of land currently unused for recreational purposes. *Recreation Property: Minutes of Hearing on H.B. 2026 Before the House Judiciary Comm.*, 36th Leg., 1st Reg.Sess. 5 (Feb. 14, 1983) (remarks of Rep. Jim Ratliff).

John Olson of the Arizona Cattle Growers' Association, testifying before the Senate Committee on Natural Resources and Agriculture, summed up the goal of the legislation in stating that "unless people who control private land receive assurances through legislation that their liability is limited, we are going to have serious access problems in the state." *Recreation Property: Minutes of Hearing on H.B. 2026 Before the Senate Comm. on Natural Resources and Agric.*, 36th Leg., 1st Reg.Sess. 3 (March 16, 1983) (remarks of John Olson).

3. Incur liability for any injury to persons or property caused by any act of a recreational user.

The scope of application is one of the principal questions addressed in litigation involving recreational use statutes. *See* Annotation, *Effect of Statute Limiting Landowner's Liability for Personal Injury to Recreational User,* 47 A.L.R.4th 262, 271. The language of recreational use statutes differs from state to state, often expressly limiting the types of landowners, activities, and lands to which they will apply. Thus courts have applied their respective statutory immunities differently. *Id.*

Our statute contains two such limitations to its scope of application. First, restriction of the landowner's duty of care applies only to a "recreational user." A.R.S. § 33–1551(A). That term is defined in subsection (B).[3] The parties agree that Bledsoe was a recreational user. We therefore do not address the issue of whether one who rides his bicycle to work on a canal road is a recreational user under the statute.

The second limitation is that the immunity applies only to owners of "premises." A.R.S. § 33–1551(A). This brings us to the primary issue: whether the Association's canal road falls within the following statutory definition of "premises":

1. "Premises" means agricultural, range, mining or forest lands, and any other similar lands which by agreement are made available to a recreational user, and any building or structure on such lands.

A.R.S. § 33–1551(B)(1).

2. *Analytical framework*

Arizona is one of only a few states that limit the scope of their recreational use statutes by reference to the type of land

covered. Comment, *Tort Liability and Recreational Use of Land,* 28 BUFF. L.REV. 767, 772–73 and nn. 27–29 (1979) (of over forty states with recreational use statutes by 1979, only seven ever had such restrictions, and two of those had eliminated those restrictions); *see also* Barrett, *supra,* 53 WASH.L.REV. at 2 and n. 10 (discussing and listing statutes). Indeed, the model act that served as the basis for many state statutes, including Arizona's,[4] does not contain a limitation based on the nature of the land. *See* 24 *Suggested State Legislation,* Public Recreation on Private Lands: Limitation on Liability 150–52 (Council of State Governments 1965). In adopting this minority position, the legislature must have considered such restrictions to be significant components of our statute.[5]

The court of appeals addressed the statutory definition of "premises" in *Walker v. City of Scottsdale,* 163 Ariz. 206, 786 P.2d 1057 (Ct.App.1989) (greenbelt area, passing through a planned residential neighborhood, was not covered under the statute). *Walker* specifically interpreted the phrase "other similar lands" because the parties agreed that the greenbelt was not "agricultural, range, mining or forest lands." *Id.* at 209, 786 P.2d at 1060. The court stated that

[i]n determining what properties are to receive the protection of the statute, characteristics such as size, naturalness, primary and secondary uses of the land, remoteness or isolation from populated areas would all be considered.

*Id.* at 213, 786 P.2d at 1064.

Bledsoe argues that the canal roads are not agricultural land and that the factors mentioned in *Walker* apply to this case and exclude the Association's canal roads from

---

**3.** A.R.S. § 33–1551(B)(2) defines "recreational user" as

a person to whom permission has been granted or implied without the payment of an admission fee or other consideration to enter upon premises to hunt, fish, trap, camp, hike, ride, swim or engage in similar recreational pursuits. The purchase of a state hunting, trapping or fishing license is not the payment of an admission fee or other consideration as provided in this section.

**4.** *See Recreation Property: Minutes of Hearing on H.B. 2026 Before the House Comm. on the Judiciary,* 36th Leg., 1st Reg.Sess. 3 (Feb. 14, 1983) (remarks of Assistant Attorney General Joseph Clifford) (stating that the language of our statute was taken from the model act).

**5.** Unfortunately, the legislative history of our statute does not provide any guidance regarding the scope of these land type restrictions.

the scope of the statute. The Association argues that the *Walker* factors are irrelevant because the canal roads fall under an enumerated property type rather than the "other similar lands" provision. The Association reasons that uncultivated land is still "agricultural land," as that term is used in the statute, if it is used to support agricultural use of other land. According to the Association, its canals are used to transport water for irrigation of crops, the roads are necessary to maintain the canals, and therefore the roads are within the enumeration of "agricultural lands."

Courts have struggled, adopting different standards, to define the boundaries of similar statutory land-type restrictions. *See Walker*, 163 Ariz. at 209–13, 786 P.2d at 1060–64; *see generally* Annot., *supra*, 47 A.L.R.4th at 298–304 (discussing differing cases and formulations). The Washington Court of Appeals, for example, dealt with a statute similar to our own in *Kucher v. County of Pierce*, 24 Wash.App. 281, 600 P.2d 683, 686 (1979). Washington's statute provided recreational use immunity to owners of "agricultural and forest lands ... and rural lands adjacent to such areas."[6] *Id.* 600 P.2d at 687. The court held that an improved, urban park could not be considered "forest lands" by examining three factors: the amount of land, its arrangement and improvements, and its proximity to population centers. *Id.* at 688. *Cf. Jones v. United States*, 693 F.2d 1299, 1303 (9th Cir.1982) (distinguishing *Kucher* and finding that an 898,000 acre federal government park seventy miles from a metropolitan area was covered by the statute).

The New Jersey courts have offered a variety of formulations regarding land type restrictions. *See generally* Comment, *Tort Liability and Recreational Use of Land*, 28 BUFF.L.REV. 767, 774–76 (1979). In one decision, the New Jersey Court of Appeals adopted an urban-rural distinction in

holding that the statute did not apply to a suburban homeowner's backyard swimming pool. *Boileau v. De Cecco*, 125 N.J.Super. 263, 310 A.2d 497 (App.Div. 1973), *aff'd*, 65 N.J. 234, 323 A.2d 449 (1974). In later decisions, the courts examined whether the recreational use was in the nature of the "true outdoors." *Diodato v. Camden County Park Comm'n*, 162 N.J.Super. 275, 392 A.2d 665, 670 (Law Div.1978). The New Jersey courts have apparently returned to a modified urban-rural distinction, examining the land's location and whether the land could be adequately supervised or controlled. *Harrison v. Middlesex Water Co.*, 80 N.J. 391, 403 A.2d 910, 914 (1979). *Cf. Wirth v. Ehly*, 93 Wis.2d 433, 287 N.W.2d 140, 146 (1980) (distinguishing *Harrison* and applying Wisconsin statute to road on land located in "rural or semi-rural environment.").

Other courts have examined whether land was undeveloped or developed. A New York appellate court applied that test in *Michalovic v. Genesee–Monroe Racing Ass'n*, 79 A.D.2d 82, 436 N.Y.S.2d 468 (1981). The defendant in that case owned a race track and apparently permitted children to use its large, asphalt parking lot for recreational activities. *Id.* 436 N.Y.S.2d at 469. A fourteen-year-old child was killed when the motorbike he was riding apparently struck either a concrete parking bumper or a chain used to direct traffic into the lot. In limiting the land types covered by the statute's grant of immunity,[7] the court stated that the legislative intent was to open "property of a relatively undeveloped nature" and did "not extend to include this asphalt parking lot, designed with equipment to control and restrict the free movement of traffic." *Id.* at 470.

### 3. *Is the canal road "agricultural land" under the Arizona statute?*

We do not believe that such analytical frameworks have any bearing on our stat-

---

6. Washington amended its statute after the accident to eliminate the terms "agricultural or forest" lands. *Kucher*, 600 P.2d at 687. *See also Bernstein v. State*, 53 Wash.App. 456, 767 P.2d 958 (1989).

7. The court restricted the type of land covered even though the New York statute did not include a specific land type provision. The court instead examined the activities covered by the statute and concluded that the legislature intended to limit the "protective scope" of the statute. *Michalovic*, 436 N.Y.S.2d at 470.

ute's enumerated land classifications. There is no reason to use such constructs to define the plain words of our enumerated land classifications when the statute includes the catch-all "other similar lands" provision. We believe, therefore, that such formulations are relevant only to our statute's "other similar lands" provision and are adequately addressed in *Walker. See* Comment, *supra,* 28 BUFF.L.REV. at 776 ("A better approach than implying geographic restrictions would be to carefully apply the exceptions contained in the statute.").

The Oregon Supreme Court reached a similar conclusion in *Tijerina v. Cornelius Christian Church,* 273 Or. 58, 539 P.2d 634 (1975). The Oregon statute was similar to Arizona's and limited its application to "agricultural land, range land, forest land, and lands adjacent or contiguous to the ocean shore ... including roads, bodies of water, watercourses, private ways, private buildings and structures on such lands and machinery or equipment on the land when attached to the realty." *Id.* 539 P.2d at 636 n. 1. The defendant in *Tijerina* argued that its land was agricultural because, among other things, it *previously* was planted to grain and "because the land is *suitable* for commercial farming." *Id.* at 635, 637 (emphasis added).

The Oregon court noted that the statute's land restrictions were intended to limit the statutory protection to those landholdings opened for recreational use that fit within the enumerated types of land use. *Id.* Thus, it concluded that the term "agricultural land" must be narrowly construed to exclude the defendant's property. *Id.* To apply the statute to all land "suitable" for agriculture, even when not put to agricultural uses, would encompass much of the state's land and negate the legislature's obvious restrictive purpose in enumerating types of land.

We find *Tijerina* persuasive and believe we also must narrowly construe our statute's enumerated land-type restrictions. To apply the statute to all land in Arizona *capable* of being used for agricultural, mining, range, or forest uses would render the limiting words meaningless. Similarly, to construe our statute to cover all properties that in some way provide *support* for agricultural lands would incorporate a tremendous portion of our state's property and vitiate our statute's land type limitation provision. Further, our statute, unlike Oregon's, contains the catch-all clause ("other similar lands") obviously intended to permit application of the statute to particular land that does not fit exactly into the types enumerated in the statute. Nor does our statute provide that it applies to "roads, bodies of water, watercourses, [or] private ways," which would give a broader scope to our enumerated land types.

▇▇▇ We thus conclude that land falls into one of the statute's enumerated types (agricultural, mining, range, or forest) when, and only when, the land is being used for such purpose. The fact that land could be used, has been used in the past, or could be used in the future for such purpose does not transform it into agricultural, mining, range, or forest land. *A fortiori,* land used for some purpose that merely *supports* one of the enumerated types is not land that is agricultural, mining, range, or forest land. In this case, the Association's roads simply support the canals that, in turn, provide water to agricultural lands. Land that is not directly used for one of the enumerated purposes, as in the present case, is not "premises" to which the statutory immunity applies unless the land qualifies as "any other similar lands." It is in determining what is a "similar land" that we look to the characteristics enumerated in *Walker.*

4. *Is an improved canal road located in an urban community covered under the statute's "other similar lands" provision?*

▇▇▇ *Walker* considered characteristics such as size, naturalness, primary and secondary use, together with proximity to populated areas. 163 Ariz. at 213, 786 P.2d at 1064. In arriving at its formulation, the court of appeals stated:

The four types of lands listed in the statute normally are relatively large ar-

eas of land. Most frequently, these types of property are located outside urban areas in thinly populated rural or semi-rural locales. All four types of land listed in the statute have as their primary use economic activities which are compatible with incidental recreational use.

Also, property of this nature is often in a natural, undeveloped state, although the express language of the statute provides that the legislature would not exclude any buildings or structures which happen to exist on such lands.

*Walker*, 163 Ariz. at 210, 786 P.2d at 1061.

Each of the characteristics noted in *Walker* is important in determining whether the road is similar to agricultural, range, mining, or forest land. We recognize that the primary purpose of the canal road is an economic activity that is "compatible with incidental recreational use." Minute Order, March 5, 1991. Yet, examining all of the *Walker* characteristics, we also conclude that the canal road in question does not fall within the "other similar lands" provision of the statute. The land in question is a man-made structure or road, small in size,[8] traversing highly urbanized areas. It is not the kind of natural land, "true outdoors" or "wilds," the statute was designed to open to public enjoyment. *See Diodato*, 392 A.2d at 670; *Walker*, 163 Ariz. at 211, 786 P.2d at 1052. We need not decide whether all canal roads will fall outside this statutory provision. In this case, however, Bledsoe was riding on a narrow strip of graded road in an urban area within the Phoenix city limits. Applying *Walker*, we conclude that he was not injured on "other similar lands." The Association, therefore, is not protected by our recreational use statute.

B. Does the *Salladay* doctrine give the Association immunity for maintaining a cable gate across a canal road?

■ In 1909, this court decided *Salladay*, limiting the liability of operators of open flumes and canals carrying water in our state. Since that time, the case has been cited for a variety of propositions and in varying circumstances to grant immunity to canal and flume operators.

The issue in *Salladay* was whether to apply the attractive nuisance doctrine [9] to a case in which a small child was killed after being swept by rushing water through an open mining flume that ended with a drop of fifteen feet or more. *Salladay*, 12 Ariz. at 127–28, 100 P. at 442. The plaintiff argued that the flume, with its rapid stream of water, was an attractive nuisance, and that "it was the duty of the defendant to maintain ... a proper inclosure, covering, or other safeguard" for the flume. *Id.* at 127, 100 P. at 441. The *Salladay* court refused to extend the attractive nuisance doctrine to impose liability for maintaining open flumes and canals. It confined the doctrine to cases in which the landowner neglected an ordinary precaution or in which the danger was unexpected or concealed. *Id.* at 130, 100 P. at 443. The court was clearly hesitant to create a rule by which landowners would be required to keep their premises "childproof." In addition to distinguishing the attractive nuisance cases, however, the court also rooted its decision firmly in public policy. The court stated, "[b]oth as a matter of law and as a matter of public policy we feel that the so-called 'turntable doctrine' should not be extended to cover" a case involving open ditches, flumes, and canals used for mining and farming pursuits. *Id.* at 129–30, 100 P. at 442.

*Salladay* itself noted three policy rationales that we believe remain important in deciding when the doctrine applies. First, the court stated that "such conduits [are] practically impossible to render harmless." *Id.* at 129, 100 P. at 442. Second, these conduits "are indispensable for the maintenance of life and prosperity" because they carry running water for use throughout a

---

8. Although the canal roads may be many miles in length, the particular narrow strip of road, similar to the greenbelt in *Walker*, is not itself a tract of open land similar to the true outdoors.

9. For a discussion of the origins of the "turntable," or attractive nuisance, doctrine, see PROSSER AND KEETON ON THE LAW OF TORTS § 59 (5th ed. 1984).

desert territory. *Id.* Third, the danger presented by the maintenance of open canals is obvious, and "the defendant was entitled to assume that the plaintiff's natural guardians would protect him from any dangers attached thereto." *Id.* at 130, 100 P. at 443.

Since the *Salladay* opinion, our courts have expanded the doctrine to protect canal operators from attractive nuisance claims involving the maintenance of essential components of a canal system. *See, e.g., Dombrowski v. Maricopa County Mun. Water Conservation Dist.*, 108 Ariz. 275, 496 P.2d 136 (1972) (whirlpool created by waterfall in canal covered by *Salladay*); *Lee v. Salt River Water Users' Ass'n*, 73 Ariz. 122, 238 P.2d 945 (1951) (weirs, or troughs, at canal pumping station found to be so similar to canal itself as to be covered by *Salladay*); *Elkins v. Roosevelt Water Conservation Dist.*, 22 Ariz.App. 130, 524 P.2d 964 (1974) (conservation district's electrical transformer adjacent to open trough covered by *Salladay*). *See also Trujillo v. Brighton–North Point Irrigation Co.*, 746 P.2d 780 (Utah 1987) (applying similar Utah doctrine refusing to extend attractive nuisance doctrine to open irrigation canals). Each of these cases fell within the traditional attractive nuisance cases of children trespassing on the land and encountering conditions inherently linked to, or part of, the unavoidable dangers resulting from unfenced canals. In each of the cases, the child was injured by the canal itself or some device closely connected with the canal.

The Association reminds us of our statement in *Dombrowski* that "[t]his court has built upon and extended the *Salladay* decision to provide almost complete immunity to irrigation districts in Arizona in the maintenance not only of the canals and diversion points, but also various mechanical and electrical equipment needed to operate the water distribution system." *Dombrowski*, 108 Ariz. at 276, 436 P.2d at 137.

Yet our courts have been more cautious in applying the *Salladay* doctrine outside the attractive nuisance arena and have done so only when policy reasons so required.[10] In *City of Glendale v. Sutter*, 54 Ariz. 326, 327, 95 P.2d 569, 569–70 (1939), the plaintiff brought a negligence action after tripping and falling into an irrigation box located near her house and built by the city to divert irrigation water to individual lot owners, including the plaintiff. The court recognized the importance of irrigation water and the widespread use of irrigation boxes to divert water to farms. *Id.* at 330–31, 95 P.2d at 570. It stated, "[w]e hardly think it would be contended that it was negligence *per se* for the city to erect adjacent to her lot and for her convenience the diversion box and leave it uncovered." *Id.* at 330, 95 P.2d at 570. But the court carefully noted that under different facts, *Salladay* might not apply, stating that "[i]n some circumstances one injured by coming in contact with a permanent structure, such as an irrigation box in an alley, might have a cause of action, if he had no previous knowledge of its existence nor any warning." *Id.* at 331, 95 P.2d at 571.

Likewise, in *Hersey v. Salt River Valley Water Users' Ass'n*, 10 Ariz.App. 321, 458 P.2d 525 (1969), the court of appeals applied *Salladay* to insulate the Association from liability when a child was ejected from a car involved in an accident on a highway adjacent to the canal, swept into an ungrated underground culvert, and drowned. The plaintiffs in that case attempted to distinguish *Salladay* by arguing that the canal owners negligently failed to maintain a grate at the entrance of the culvert. The court recognized the strong policy reasons set forth in *Salladay* regarding the need for open conduits for transporting water, but noted that "[i]t might well be that with the developing concentration of population and the increase of traffic along our public highways, a countervailing public policy has devel-

---

**10.** *Dombrowski* itself states that "[i]t may be that in a proper case there can be shown a 'meaningful distinction' between the immunity that this court has historically given to open irrigation canals on the one hand, and the negli- gent design and maintenance of mechanical or electrical equipment, weirs, dams and diversion points in congested urban areas on the other hand." 108 Ariz. at 277, 496 P.2d at 138.

oped which would require that the immunity granted in *Salladay* be tempered." *Id.* at 327, 458 P.2d at 531. The court decided, however, that it was "bound by the prior decisions of the Arizona Supreme Court until changed by that court," and the plaintiffs' arguments were not a "meaningful distinction" sufficient to escape the reasoning of *Salladay* that maintaining open canals and their essential components is not negligence. *Id.* at 327, 458 P.2d at 327.

In *Ramada Inns, Inc. v. Salt River Valley Water Users' Ass'n*, 111 Ariz. 65, 523 P.2d 496 (1974), the plaintiff attempted to hold the canal owners strictly liable when water overflowed the canal banks and damaged a nearby hotel. The plaintiff argued that "the canal has become, because of the increase in population [in Phoenix], an inherently dangerous instrumentality." *Id.* at 66, 523 P.2d at 497. Partially based on the reasoning in *Salladay* regarding the necessity for the continued existence of the canal system, we held that strict liability did not apply. *Id.* at 67–68, 523 P.2d at 498–99. In negligence cases, however, our courts have not protected canal owners from liability for flooding. In *Taft v. Ball, Ball & Brosamer, Inc.*, 169 Ariz. 173, 818 P.2d 158 (Ct.App.1991), the court of appeals decided that Central Arizona Project canal builders could be liable for negligence in the manner in which they build and maintain canals when flooding results. *See also Markiewicz v. Salt River Valley Water Users' Ass'n*, 118 Ariz. 329, 576 P.2d 517 (Ct.App.1978) (distinguishing *Ramada Inns* to find basis for negligence liability for flooding caused by canals).

Finally, in some instances, we have simply refused to apply the policy articulated in *Salladay*. In *Harris v. Buckeye Irrigation Co.*, 118 Ariz. 498, 578 P.2d 177 (1978), we refused to apply *Salladay* to the negligent construction and maintenance of a bridge over an irrigation canal. The bridge was needed to permit operation of a canal checkpoint. Many people from surrounding neighborhoods, however, also used the bridge to cross the canal to gain access to a nearby high school. *Id.* at 499, 578 P.2d at 178. The plaintiffs' twelve-year-old son was killed when he rode his bicycle off the bridge. Speaking through Justice Cameron, we held that

> under the peculiar facts of this case public policy does not require the application of the *Salladay* immunity doctrine. This, it seems, is the only way that the defendants and others in like situations can be prevented from using a grant of immunity as an excuse not to exercise reasonable care to protect members of the public....

*Id.* at 502, 578 P.2d at 181.

Recognizing, therefore, that we have not held canal operators completely immune from liability and that this case does not involve the attractive nuisance doctrine, we return to the original rationales in *Salladay* to determine whether its immunity applies to this case. First, we examine the ability to render cable gates harmless. The Association argues that it hung reflective signs on its cable gates that ordinarily made them visible and could do nothing further to render them harmless. While this certainly has a bearing on the question of negligence, the dangers presented by canal roads as such are simply not comparable to the operator's inability to protect children from the inherent, unavoidable dangers of open canals.

The second basis of the *Salladay* doctrine relates to the importance of water to an arid state. The Association argues that canal roads are vital to the maintenance and operation of the canals. Gates allow it to restrict access to the roads, thus enhancing its ability to operate the canals. Even assuming all this, we again believe it more relevant to the question of whether the Association was negligent in this case than it is to whether this court should declare that a canal operator can never be liable for negligence in the manner in which it maintains a canal road open to the public. We are willing to accept the proposition that canal roads are essential to the maintenance of canals, and possibly, therefore, that the mere construction of a canal road is not, in and of itself, an act for which the operator can be held liable. We cannot accept, however, what is implicit in the Association's further submission—that the

canal operator is also immune from liability for negligence in the manner in which it maintains those roads, so that it is free to stretch chains, install spring guns, dig pits, plant stakes, or otherwise "restrict access" to roads it *knows* the public is permitted to use and does use. We do not believe that extending *Salladay* immunity in such a manner is essential to ensure the continued delivery of irrigation water to our arid land.

Third, we examine the obviousness of the danger. This case, unlike *Salladay*, does not involve the inherent danger of the structure—a road in this case and a canal in *Salladay*. It involves the use of cable gates, and, while *this* cable gate may or may not have been clearly visible, one cannot say that the danger from cable gates, like irrigation canals, is inherently so open and obvious that under all circumstances and as a matter of law the operator cannot be charged with negligence. *See Beach v. City of Phoenix*, 136 Ariz. 601, 604, 667 P.2d 1316, 1319 (1983) (open and obvious condition did not end defendant's duty of care but, instead, was relevant to question of negligence).

Considering the bases for *Salladay*, we conclude that it is properly applied to claims based on the theory that the operation of an unfenced canal and its equipment is per se an act of negligence. We need not decide whether merely constructing a canal road is likewise within the *Salladay* immunity. It is sufficient for us to hold that *Salladay* is inapplicable if there is evidence the canal operator maintained the road in a manner that was unreasonably dangerous given the foreseen and permitted use by the public. This disposition makes it unnecessary to reach the other contentions raised, including the argument that *Salladay* should be overruled.

## CONCLUSION

For the above reasons, we find that A.R.S. § 33–1551 and the *Salladay* doctrine do not apply to the facts of this case. Therefore, we grant relief and vacate the order granting partial summary judgment.

The trial court shall proceed in a manner consistent with this opinion.

GORDON, C.J., and MOELLER, J., concur.

Justice ROBERT J. CORCORAN recused himself and did not participate in the determination of this matter.

CAMERON, Justice, dissenting.

I regret that I must dissent. I do so for the following reasons:

First, I believe the canal bank roads qualify as agricultural lands under the definition of "premises" in A.R.S. § 33–1551(B)(1).

Agricultural lands are lands that are used for or in connection with agriculture. The canals transport water so that land may be put to agricultural uses that our dry climate could not otherwise permit. The canals and their support roads are necessary to sustain our agricultural economy. The majority opinion is shortsighted. It exposes the canal owners to undue liability by too narrowly restricting the definition of "premises."

Second, there is no reason not to apply the *Salladay* doctrine in the instant case. We do not find here the callous indifference which caused us not to apply the *Salladay* doctrine in *Buckeye Irrigation*. In that case, we stated:

The immunity given to irrigation districts in *Salladay, supra,* was based in sound public policy at the time. It is sound public policy today as far as the use of canals and canal banks are concerned. Unfortunately, this immunity sometimes leads to the callous "public be damned" policy exemplified by the testimony of the manager of the defendant irrigation company in the instant case. The statement of the manager that it was "not my responsibility to see that everything on our canal system is safe for anybody's use" and that he is only concerned with the safety of his employees and not anyone else's is the direct result of the belief by the irrigation company that because of *Salladay, supra,* it had absolute immunity from suit....

[U]nder the peculiar facts of this case public policy does not require the application of the *Salladay* immunity doctrine. This, it seems, is the only way that the defendants and others in like situations can be prevented from using a grant of immunity as an excuse not to exercise reasonable care to protect members of the public....

*Buckeye Irrigation,* 118 Ariz. 498, 502, 578 P.2d 177, 181 (1978).

The defendants in this case took reasonable steps to protect recreational users from dangerous conditions. They painted the cable with reflective paint, indicating their sensitivity to the users of the canal bank. They tried to warn canal bank users of the chains that were necessary to keep automobiles from entering the premises. Opening the canal banks to automobiles would have been more dangerous for the pedestrians and bicyclists. The Association took precautions to protect the safety and welfare of recreational users of the Salt River Canal.

Third and finally, I am fearful that the majority opinion will cause canal companies and owners of other properties to close their facilities to recreational use by the public.

I therefore dissent.