Strafford
No. 2007-633

DENNIS BELHUMEUR & a.

v.

JASON ZILM & a.

Argued: March 27, 2008
Opinion Issued: May 2, 2008

*Law Offices of Harvey J. Garod*, of Meredith (*Harvey J. Garod* on the brief and orally), for the plaintiffs.

*Getman, Stacey, Schulthess & Steere, P.A.*, of Bedford (*Michael W. Wallenius* on the brief and orally), for the defendants.

HICKS, J. The plaintiffs, Dennis and Shirley Belhumeur, appeal an order of the Superior Court (*Fauver*, J.) granting summary judgment to the defendants, Jason and Jessica Zilm, in this action for negligence and nuisance. We affirm.

The plaintiffs' amended writ of summons alleged the following: The defendants own property in Dover abutting property upon which the plaintiffs reside. On or about June 29, 2006, Mr. Belhumeur was injured as a result of being attacked by wild bees that the defendants had "allowed . . . to nest in a tree on or about [their] premises." Mr. Belheumer's answers to interrogatories indicate that he was on his own property when the incident occurred. The plaintiffs' writ alleged that the defendants had "actual or constructive knowledge of [the bees'] existence and aggressive behavior."

The first count of the plaintiffs' writ alleged that the defendants breached "a duty to use ordinary, reasonable and due care to protect [the plaintiffs] from unreasonable risk of injury while on the plaintiffs' residential premises." The second count alleged that "the defendants allowing wild bees on the premises actively, substantially and unreasonably interfered with the plaintiffs' use and enjoyment of the plaintiffs' leasehold and constituted a private nuisance."

The defendants moved for summary judgment contending, among other things, that they are not liable for either: (1) hazards occurring naturally on their property that injure someone on another property; or (2) "injuries caused by wild animals." The trial court granted the motion.

On appeal, the plaintiffs argue that the trial court erred: (1) in finding no common law duty on the part of the defendants to abate the wild bees; and (2) in failing to find that "Mr. Zilm created a duty by affirmatively undertaking to remove the tree and bees, and then failing to act reasonably by abandoning the effort." We will examine each contention in turn.

Our standard of review is well-settled:

> When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the nonmoving party. If our review of the evidence does not reveal any genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision.

*Macie v. Helms*, 156 N.H. 222, 224 (2007) (quotation omitted).

The plaintiffs first contend that "[t]he trial court erred by determining, under the circumstances of this case, there existed no common law duty requiring the defendants to abate the wild bees." Although they specifically challenge a common law rule that the trial court applied only to their negligence claim, as opposed to their nuisance claim, they assert that while "[m]odern case law is scant, . . . injured plaintiffs have been able to recover when bringing claims founded in negligence or nuisance." (Citations omitted.) Thus, we consider their first argument on appeal as a challenge to the trial court's rulings on both their negligence and nuisance claims.

With respect to the plaintiffs' nuisance claim, the trial court found that the defendants could not be held liable in nuisance "for wild animals that exist on their land as a natural occurrence." We agree. The "established common law rule [is] that a land owner is under no affirmative duty to remedy conditions of purely natural origin upon his land even though they are dangerous or inconvenient to his neighbors." *Lichtman v. Nadler*, 426 N.Y.S.2d 628, 629 (App. Div. 1980), *appeal dismissed*, 53 N.Y.2d 704 (N.Y. 1981). Stated alternatively: "In order to create a *legal* nuisance, *the act of man* must have contributed to its existence." *Merriam v. McConnell*, 175 N.E.2d 293, 296 (Ill. App. Ct. 1961) (quotation omitted).

Although the plaintiffs contend that the defendants failed to rid their property of the wild bees, they do not allege that the defendants "contributed to [the] existence" of the bees or their nest on the property. *Id.* (quotation omitted). Accordingly, the bees must be considered a "condition[] of purely natural origin," *Lichtman*, 426 N.Y.S.2d at 629, and the trial court properly granted summary judgment for the defendants on the nuisance claim.

■ With respect to the plaintiffs' negligence claim, the trial court ruled that the defendants could not be held liable for "the independent acts of wild animals" neither possessed nor harbored by them. The court's ruling is based upon the doctrine of animals *ferae naturae,* "a common law doctrine tracing its origins back to the Roman empire whereby wild animals are presumed to be owned by no one specifically but by the people generally." *Nicholson v. Smith,* 986 S.W.2d 54, 60 (Tex. App. 1999) (footnote omitted); *cf. Beach v. Morgan,* 67 N.H. 529, 531 (1893) (holding that while plaintiff could recover for the defendant's trespass onto his land, he could not recover the value of the fish taken from a stream thereon, as they were *ferae naturae*). This doctrine has spawned a "rule of law . . . that a landowner cannot be held liable for the acts of animals *ferae naturae,* that is, indigenous wild animals, occurring on his or her property unless the landowner has actually reduced the wild animals to possession or control, or introduced a non-indigenous animal into the area." *Nicholson,* 986 S.W.2d at 60.

As to preclusion of strict liability to invitees on the defendant's land, the doctrine of *ferae naturae* is apparently well settled. *Id.* at 61; *cf. King v. Association,* 100 N.H. 212, 219 (1956) ("Contrary to the views of many jurisdictions we do not as a matter of judicial policy impose absolute liability for damage by wild animals."). As applied to negligence claims, however, the doctrine is less clear. The *Nicholson* court noted that "most courts which have considered the issue recognize the possibility that a claim for negligence may not be precluded by *ferae naturae* per se." *Nicholson,* 986 S.W.2d at 61. Nevertheless, despite recognizing the *possibility* of imposing a duty upon landowners to protect against the acts of wild animals, apparently "few [courts] have actually done so." *Id.*

In determining whether the doctrine should apply in this case, we are guided by the following general principles: "Claims for negligence rest primarily upon a violation of some duty owed by the offender to the injured party. Absent a duty, there is no negligence. Whether a duty exists in a particular case is a question of law." *Walls v. Oxford Management Co.,* 137 N.H. 653, 656 (1993) (quotations and citations omitted). We recognize that "duty is an exceedingly artificial concept," *id.* (quotation omitted); therefore,

[w]hen charged with determining whether a duty exists in a particular case, we necessarily encounter the broader, more fundamental question of whether the plaintiff's interests are

entitled to legal protection against the defendant's conduct. The decision to impose liability ultimately rests on a judicial determination that the social importance of protecting the plaintiff's interest outweighs the importance of immunizing the defendant from extended liability.

*Id.* at 657 (quotations and citation omitted).

The plaintiffs argue that "[a]lthough perhaps well-founded in agrarian times," the application of the *ferae naturae* rule in modern times and metropolitan areas, "where people live in close proximity, is questionable." We note, however, that the doctrine is actually based upon a reality not appreciably altered by the passage of time; namely, the unpredictability and uncontrollability of wild animals. *See Booth v. State*, 83 P.3d 61, 65 (Ariz. Ct. App. 2004) (noting that "in negligence cases, courts have used the term *ferae naturae* as shorthand for the general proposition underlying the doctrine"; namely, "that wild animals exist throughout nature, they are generally not predictable or controllable, and therefore, without more, they are neither the property nor the responsibility of the owner or occupier of land on which they are found").

We believe that the doctrine of animals *ferae naturae*, as stated herein, reasonably balances the interests of landowners and the interests of those who may be harmed by the actions of wild animals found on or emanating from the landowners' property. While we do not lightly dismiss "the social importance of protecting the plaintiff[s'] interest" in avoiding injury caused by wild bees, we find that interest outweighed by "the importance of immunizing the defendant[s] from extended liability." *Walls*, 137 N.H. at 657 (quotation omitted). We find *Nicholson* instructive on this issue:

> Under ordinary circumstances, Texas landowners do not have a duty to warn their guests about the presence and behavior patterns of every species of indigenous wild animals and plants which pose a potential threat to a person's safety, as well as the extent of that threat. If a landowner was required to affirmatively disclose all risks caused by plants, animals, and insects on his or her property, the burden on the landowner would be enormous and would border on establishing an absolute liability.

*Nicholson*, 986 S.W.2d at 63-64 (quotation omitted).

Similarly, we conclude that to require a landowner to abate all harm potentially posed to his neighbors by indigenous animals, plants or insects naturally located upon his property would impose an enormous and unwarranted burden. *Cf. King*, 100 N.H. at 219 (noting our "judicial policy" against imposition of "absolute liability for damage by wild animals").

Accordingly, we uphold the trial court's ruling that "[t]he defendants . . . cannot be liable to their neighbors in negligence for the independent acts of wild animals that are not possessed or harbored by the defendants." Like the *Nicholson* court, "[w]e do not say that there never can be [liability in] such a case. But this case fits within the rule, not the exception." *Nicholson*, 986 S.W.2d at 64.

The plaintiffs next argue that the trial court erred in failing to find that Mr. Zilm created a duty to remove the tree and bees by affirmatively undertaking to do so. The defendants contend that no duty is created "when a party never attempts a planned undertaking." The trial court ruled consistently with the defendants' theory, concluding that "[t]he defendants cannot be liable in negligence for failing to protect the plaintiffs from the wild animals where the defendants made no affirmative undertaking to protect the plaintiffs from the wild animals."

In assessing the consequences of Mr. Zilm's actions, the trial court assumed the truth of the plaintiffs' allegations, which the court summarized, in relevant part, as follows: "Mr. Belhumeur informed Mr. Zilm in 2003 that the bees were trespassing onto Mr. Belhumeur's leasehold property and constituted a danger. Mr. Zilm acknowledged the problem and agreed to remove the tree. Mr. Zilm never made any attempts to follow through with the tree removal." We note that Mr. Belhumeur also alleges in his affidavit that "at Mr. Zilm's instruction," he obtained proposals from two contractors for the removal of the tree.

We have recognized that "[a] party who does not otherwise have a duty, but who voluntarily renders services for another, . . . [may be] held to a duty of reasonable care in acting." *Walls*, 137 N.H. at 656. We also agree with the principle, however, that "[a] mere promise to render a service coupled with neither performance nor reliance imposes no tort obligation upon the promisor." *Fort Bend County Drainage D. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991).

In *Sbrusch*, for instance, the court considered statements on behalf of the defendant drainage district in response to notification that a privately-owned bridge was unsafe; specifically, the notifying party testified that a bridge foreman told him " 'We will take care of it' " and the district superintendent "told him 'he was going to see what the District could do about it and talk to the bosses about it.' " *Id.* at 394 (brackets omitted). The court concluded that these statements did "not constitute an undertaking of an affirmative course of action" that would subject the district to liability for injury caused by the bridge's collapse. *Id.* at 397. Similarly, we conclude

that Mr. Zilm's "acknowledge[ment of] the problem and agree[ment] to remove the tree" would not, without more, subject him to liability should he fail to carry out that agreement.

The plaintiffs assert, however, that "Mr. Zilm went beyond a mere promise" by "obtain[ing] bids to rectify the unreasonably dangerous condition." They then urge us to conclude that "Mr. Zilm's actions were sufficient to create a duty to act reasonably and remove the tree and bees before this unfortunate incident occurred." The defendants criticize the plaintiffs' argument as "suggest[ing] that the mere consideration of an action creates a legal duty."

■ The trial court implicitly concluded that obtaining estimates for the tree's removal was not enough of an affirmative undertaking to create a duty to actually remove it. We agree. In determining how much action is sufficient to create a duty, we are guided by the words of Chief Justice Cardozo in *H.R. Moch Company v. Rensselaer Water Company*, 159 N.E. 896 (N.Y. 1928):

> What we need to know is the conduct that engenders the relation. . . . If conduct has gone forward to such a stage that in action [*sic*] would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. . . . The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good.

*H.R. Moch Co.*, 159 N.E. at 898. To similar effect is the principle stated in *Sbrusch*:

> The fact that an actor starts to aid another does not necessarily require him to continue his services. An actor may abandon his services at any time irrespective of his motivations for doing so unless, by giving the aid, he has put the other in a worse position than he was in before. A person is put in a worse position if the actual danger to him has been increased by the partial performance, or if in reliance he has been induced to forego other opportunities of obtaining assistance.

*Sbrusch*, 818 S.W.2d at 397; *accord* RESTATEMENT (SECOND) OF TORTS § 323 (1965). We note that the plaintiffs neither pled nor argued a theory of detrimental reliance and contend on appeal that reliance is "not necessary to the cause of action."

Here, Mr. Zilm's obtaining estimates to remove the tree did nothing to increase the risk of danger to Mr. Belheumer or put him in any worse position than he was in before Mr. Zilm agreed to remove the tree. The risk of injury by the bees remained exactly the same before and after the estimates were obtained. Therefore, securing the proposals did not create a duty and Mr. Zilm was free to abandon the effort, as his "inaction [was] at most a refusal to become an instrument for good." *H.R. Moch Co.*, 159 N.E. at 898.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.