IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| JERRY BOOTH, a married man, and CELINA BOOTH and MELINA BOOTH, minor children, by and through their parent JERRY BOOTH, | ) ) ) ) ) | |
| Plaintiffs/Appellees, | ) ) | 2 CA-CV 2003-0097 DEPARTMENT B |
| v. | ) ) | O P I N I O N |
| STATE OF ARIZONA, a political entity, | ) ) | |
| Defendants/Appellants. | ) ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C336464

Honorable John F. Kelly, Judge

AFFIRMED

The Rabb Penny Law Firm
  By Lloyd L. Rabb, III                                                    Tucson

    and

James G. Heckbert                                        Steamboat Springs, Colorado
                                                    Attorneys for Plaintiffs/Appellees

Terry Goddard, Arizona Attorney General
  By Daniel P. Schaack                                                      Phoenix
                                               Attorneys for Defendants/Appellants

Jones, Skelton & Hochuli, P.L.C.
  By Randall H. Warner                                                     Phoenix
                                                        Attorneys for Amicus Curiae
                                              County Supervisors Association

E C K E R S T R O M, Judge.

¶1        In this appeal, we are asked to decide whether the trial court erred in allowing a jury to determine that the state negligently had failed to prevent elk from entering portions of Interstate 40 (I-40) just east of Flagstaff. Based on the particular facts presented in this case, we conclude that the issue was properly presented to the jury and affirm the judgment entered below.

¶2        In December 1998, Jerry Booth was severely injured when the car he was driving collided with an elk lying in the roadway on I-40 near milepost 211. He sued the state on his own behalf and that of his daughters, alleging that I-40 was not reasonably safe due to the presence of elk on the highway. At trial, he contended that the state negligently had failed to evaluate the known hazard of elk crossing the highway, use appropriate fencing, clear cut vegetation, or reduce the speed limit. The state moved for summary judgment, arguing that it could not be held liable for an injury caused by a wild animal not in the state's possession or control. The trial court denied the motion, and the jury returned a substantial verdict in favor of the Booths. On appeal, the state argues that it was entitled to judgment in its favor as a matter of law.[1]

---

[1]The state also moved for a judgment as a matter of law following the close of the plaintiffs' case-in-chief. After the verdict, the state filed a motion for new trial, claiming the trial court incorrectly had denied the state's motion for judgment as a matter of law and, among other things, that it improperly had instructed the jury. In its notice of appeal, the state specified that it was challenging the trial court's denial of the motion for new trial, but, other than a conclusory statement in its opening brief that the court's "erroneous instruction . . . prodded the jury to find for these Plaintiffs," it has not raised any other issues on appeal. Therefore, we need only decide whether the jury should have been allowed to determine if the state had been negligent.

2

¶3        Viewed in the light most favorable to upholding the verdict, *Mealey v. Arndt*, 206 Ariz. 218, ¶12, 76 P.3d 892, ¶12 (App. 2003), the following facts were presented below and are not challenged by the state. Elk are indigenous to the area around I-40 in the proximity of the collision site, and their population had been increasing since the late 1980s. In the years preceding the collision, the state had placed signs on the relevant segment of highway which warned motorists they had entered "elk country." The state also placed elk and deer silhouette signs every five miles in that area. Elk generally weigh between 550 and 850 pounds. They are most active at night, when it is most difficult for drivers to see them. A traffic engineer testified on behalf of the state that even an attentive driver traveling at the posted speed limit of seventy-five miles per hour would not have time to react if an elk were to dart out onto the highway.

¶4        The fencing along I-40 is not designed to, and does not, keep elk off the highway. As the elk population increased, so too did the number of collisions between elk and automobiles. In the late 1980s, automobile collisions involving elk increased at rates of up to one hundred percent per year. On the section of I-40 within about five miles on either side of the accident site, there were 168 reported collisions between automobiles and elk or deer between 1994 and 2000—an average of over two collisions per mile per year. In response to the increased accident rate, the state posted additional warning signs but took no other measures aimed at preventing collisions with elk.

¶5        The Booths introduced evidence that the Federal Highway Administration has adopted standards providing that "[f]encing along a highway is a means of preventing unwanted and likely intrusion of animals . . . from outside the right-of-way line . . . into the vicinity of moving traffic or onto the operating right-of-way," and that seven- to ten-foot high fences "may

3

be needed along the highway at the few elk and buffalo ranges in the western States."[2] An expert for the Booths testified that nine other states and Canada use eight-foot fences and underpasses to prevent elk and deer from accessing interstate highways. He also testified that wildlife warning signs are not effective in reducing collisions between animals and automobiles. Reports collected by an employee of the Arizona Game and Fish Department indicated that the construction of higher fences and wildlife underpasses could reduce such collisions by as much as ninety-six percent.

¶6        The Booths also introduced evidence that these and other additional steps to prevent collisions between vehicles and elk have been implemented on a different Arizona highway. The evidence included a report by the Arizona Department of Transportation, a portion of which provides that "[i]n 1994, Arizona State Route 260 [SR-260] was identified as a route requiring immediate action to reduce rapidly increasing accidents" involving deer and elk. According to the report, such collisions had occurred in one twenty-mile section of that highway at a rate of 1.22 collisions per mile per year between 1992 and 1997. The report characterized that accident rate as "excessive." The Booths also established that in conjunction with the widening of SR-260, the state had implemented a mediation plan called "Project Elk Alert." The project included public education to warn of the hazard on that particular roadway, vegetation management to improve visibility and reduce the amount of palatable vegetation on the road shoulders, and wildlife fences and underpasses designed to keep elk off the highway while allowing them to cross from side to side.

---

[2]Although Arizona has not adopted these standards by statute, they are used as "guide[lines] in designing and developing" roadway plans.

4

¶7　　　　Citing the court's ability to "set the outer limits" of what may be considered a negligent act, the state argued in its briefs that we should adopt the "doctrine of *ferae naturae*" and hold as a matter of law that the state cannot be held liable for injuries caused by indigenous wild animals.[3] *Ferae naturae* means "of a wild nature or disposition." *See Black's Law Dictionary* 635 (7th ed. 1999). The doctrine of animals *ferae naturae* relates primarily to property rights. *See Nicholson v. Smith*, 986 S.W.2d 54, 60-61 (Tex. App. 1999). A wild animal, *ferae naturae*, as opposed to a domesticated animal, *domitae naturae*, is owned by the state or the people at large. An individual does not acquire property rights in an animal *ferae naturae* as long as the animal remains wild, unconfined, and undomesticated. *Id.* Even a landowner does not acquire property rights to the wild animals naturally existing on his or her land unless they are reduced to actual possession and control. *Id.*

¶8　　　　From this doctrine has emerged the general principle that a landowner cannot be held *strictly* liable for the acts of animals *ferae naturae* on his land. *See, e.g., id.* This case, however, sounds in negligence, not strict liability, and even cases relied upon by the state recognize that the doctrine does not completely bar liability for claims based on the negligence of

---

[3]At oral argument, the state appeared to modify its position, noting that the *ferae naturae* doctrine does not categorically bar all negligence claims involving wild animals. The state also clarified that it did not seek absolute immunity from liability in all such highway accident cases. But the state did not clearly articulate when, under its new theory, liability might attach other than when a governmental body somehow increases the risk of harm caused by a wild animal. The state suggested liability might also attach when the state has had actual knowledge that a group of animals or the specific animal causing injury was on or near the roadway at a specific point in time. But the state did not further define or cite any authority for its proposed test. In addition, the state did not ask us to consider such nuances in its opening brief and gave no opportunity for Booth to respond in its answering brief. We therefore address the argument as it was presented in its opening brief, not as modified at oral argument.

the defendant. "[M]ost courts [that] have considered the issue recognize the possibility that a claim for negligence may not be precluded by *ferae naturae* per se[;] . . . [those] courts generally agree they *may* impose a duty on a premises owner" for negligent acts causing injury from wild animals. *Id.* at 61. In practice, few courts have actually imposed such a duty. *Id.* Given the fact that wild animals are not readily controllable and are often unpredictable, that result is not surprising. In most of the cases cited by the state, the defendants were found not liable precisely because they could not reasonably have foreseen an injury or protected against it. *See, e.g., Brunelle v. Signore*, 263 Cal. Rptr. 415, 419 (App. 1989) (homeowner not liable for spider bite injury when, among other factors, he had never seen type of spider in or around home and had not seen particular spider before guest was bitten); *Wamser v. City of St. Petersburg*, 339 So. 2d 244, 246 (Fla. Dist. Ct. App. 1976) (no duty to guard or warn against an attack by an animal *ferae naturae* in the absence of reasonable foreseeability of danger); *Rippy v. Fogel*, 529 A.2d 608, 610 (Pa. Commw. Ct. 1987) (no governmental liability for collision with animal *ferae naturae* because risk was not conceivably correctable); *Nicholson*, 986 S.W.2d at 59-64 (considering foreseeability, likelihood of injury, and magnitude of burden of guarding against injury in determining liability for injury from animals *ferae naturae*).

¶9 The state cites no case in which a court has categorically barred negligence claims based on injuries caused by wild animals. Rather, in negligence cases, courts have used the term *ferae naturae* as shorthand for the general proposition underlying the doctrine—that wild animals exist throughout nature, they are generally not predictable or controllable, and therefore, without more, they are neither the property nor the responsibility of the owner or occupier of land on

6

which they are found. Thus, the doctrine has not been historically applied so as to alter the traditional analysis of a negligence claim.

¶10 "The basic elements of actionable negligence are a duty owed to the plaintiff, a breach thereof and an injury proximately caused by the breach." *Ballesteros v. State*, 161 Ariz. 625, 627, 780 P.2d 458, 460 (App. 1989). Duty is simply a question of whether "the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff." *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 356, 706 P.2d 364, 368 (1985). If there is a duty, then a defendant must "act reasonably in light of the known and foreseeable risks. It is here, in determining whether the defendant acted reasonably or negligently, that the law concerns itself with specifics of defendant's conduct." *Id.* at 357, 706 P.2d at 369. What is reasonable necessarily depends on the circumstances. *Id.* In this case, the cause of Jerry Booth's injuries is not disputed, and the state concedes that it has a duty to keep the highways reasonably safe for the traveling public. *See Dunham v. Pima County*, 161 Ariz. 304, 306, 778 P.2d 1200, 1202 (1989); *Bach v. State*, 152 Ariz. 145, 147, 730 P.2d 854, 856 (App. 1986). It also concedes that reasonableness is generally a jury question, *see id.* at 358, 706 P.2d at 370, and *Bellezzo v. State*, 174 Ariz. 548, 551, 851 P.2d 847, 850 (App. 1992), but asserts that, in this case, the claimant did not present adequate facts to submit to the jury on that question.

¶11 Because the standard of care required to fulfill a duty is a question of reasonableness, a court may grant judgment as a matter of law only if no reasonable jury could find the defendant's conduct unreasonable. *Markowitz.* Under the facts of this case, a reasonable jury could conclude that the state had breached its duty to Jerry Booth by failing to take protective measures beyond posting warning signs. Based on the testimony and exhibits offered by both

sides, including the collision data presented at trial, a jury could reasonably conclude that the state had ample notice of a dangerous condition on this portion of I-40.  A jury could also reasonably conclude that the state had breached its duty of reasonable care based on, among other things, the additional measures taken to prevent the same harm in an area that presented only about half the risk.  Under these particular facts, the trial court did not err in submitting the Booths' negligence claims to the jury.

¶12        In support of a different result, the state relies principally on two out-of-state cases it insists provide authority for precluding governmental liability for claims based on highway collisions with wild animals:  *Rippy* and *State v. Mann*, 47 N.Y.S.2d 553 (Ct. Cl. 1944).  *Rippy* is not particularly helpful to the state because the court there did not address whether the Commonwealth of Pennsylvania had breached a duty of care to the plaintiff.  Rather, the court addressed whether the plaintiff's claim fell within an exception to Pennsylvania's statutory immunity—permitting liability for a dangerous condition on a highway.  *Id.*, 529 A.2d at 609; *see also* 42 Pa. Cons. Stat. Ann. § 8522(b)(4).  In rejecting the plaintiff's argument, the court in *Rippy* stated:

> Short of fencing every inch on Commonwealth-owned highway in non-urban areas or permitting a wholesale obliteration of this Commonwealth's deer population, we can conceive no method of correcting the problem of wild animals wandering onto the highways.  As neither of these methods is feasible, the problem of wild animals on the highways is simply not "conceivably correctable" . . . .

529 A.2d at 610, *quoting Mistecka v. Commonwealth*, 408 A.2d 159, 162 (Pa. Commw. Ct. 1979).  In this case, however, the record does not compel a finding, particularly as a matter of

8

law, that the dangerous condition at the accident site was not "conceivably correctable." And, unlike *Rippy*, this case does not involve statutory sovereign immunity or exceptions thereto.

¶13      Although *Mann* is more applicable here than *Rippy*, it is not contrary to our decision. In *Mann*, the court dismissed the plaintiff's negligence action in which the plaintiff had alleged only that a deer had attempted to cross a highway and caused a collision with his vehicle. 47 N.Y.S.2d at 554. But neither the plaintiff nor his counsel appeared for trial in *Mann.* And, although the court rejected the plaintiff's allegation that the state had negligently failed to install "'suitable guards, railings or fences in preventing wild animals access upon [the] highway,'" the court based its ruling on the absence of "a duty . . . to erect fences, or their equivalent, at all highway points accessible to wild animals, or in effect—along every foot of all State highways." *Id.* Our supreme court, however, repeatedly has rejected "attempt[s] to equate the concept of 'duty' with such specific details of conduct." *Coburn v. City of Tucson*, 143 Ariz. 50, 52, 691 P.2d 1078, 1080 (1984); *see also Isbell ex rel. Isbell v. Maricopa County*, 198 Ariz. 280, ¶¶8-9, 9 P.3d 311, ¶¶8-9 (2000) (county's duty to maintain safe roadways was constant, and conflicting evidence raised triable issue of fact on whether county breached duty through specific conduct); *Martinez v. Woodmar IV Condos. Homeowners Ass'n, Inc.*, 189 Ariz. 206, 211, 941 P.2d 218, 223 (1997) (characterizing case as of "the type in which courts are tempted to blur the concepts of duty and negligence"). In Arizona, it is undisputed that the state has an unchanging duty to keep its roadways reasonably safe for travel and that, generally, the question of whether that duty was breached is for the trier of fact.

¶14      Finally, although the court in *Mann* suggested in dicta that any action for injuries caused by deer on the highways would place an unreasonable burden on the state, the court's

holding was based on a New York common law doctrine of sovereign immunity for injuries resulting from governmental actions taken in the public trust. 47 N.Y.S.2d at 554. Arizona, however, long ago abolished the common law doctrine of sovereign immunity. *See Stone v. Ariz. Highway Comm'n*, 93 Ariz. 384, 381 P.2d 107 (1963); *see also Ryan v. State*, 134 Ariz. 308, 310, 656 P.2d 597, 599 (1982) ("the parameters of duty owed by the state will ordinarily be coextensive with those owed by others," subject to legislative regulation); *see also Dickey ex rel. Dickey v. City of Flagstaff*, 205 Ariz. 1, ¶14, 66 P.3d 44, ¶14 (2003).

¶15          The County Supervisors Association, which has appeared as *amicus curiae*, urges us to adopt the state's position as a matter of public policy. It analogizes the state's highways to water canals in that they are both "indispensable for maintaining life and prosperity," *see Salt River Valley Water Users' Ass'n v. Superior Court*, 178 Ariz. 70, 75, 870 P.2d 1166, 1171 (App. 1993), and asserts that the same policy considerations which justify the Salladay doctrine and the fireman's rule preclude liability here. *See Salladay v. Old Dominion Mining & Smelting Co.*, 12 Ariz. 124, 100 P. 441 (1909) (precluding liability of flume owner in attractive nuisance claim); *Grable v. Varela*, 115 Ariz. 222, 223, 564 P.2d 911, 912 (App. 1977) ("[A] fireman has no cause of action against one whose negligence caused the fire in which he was injured."); *see also Salt River Valley Water Users' Ass'n*, 178 Ariz. at 75, 870 P.2d at 1711 (discussing application of *Salladay* doctrine to canals).

¶16          The *Salladay* doctrine and the fireman's rule are based primarily on policy considerations, but those policy concerns do not apply here. Although canals and highways may be of equal importance to our state, they are used very differently. The public does not use canals for transportation. Therefore, the risks associated with the canal system and the highway system

10

are simply not comparable. The rationale for the fireman's rule is that emergency workers who hold jobs that present inherent risks are compensated for performing those duties and therefore should not be entitled to bring a private cause of action when they suffer harm from those risks. *See Grable*, 115 Ariz. at 223, 564 P.2d at 912 ("'[T]he fireman should receive appropriate compensation from the public he serves, both in pay which reflects the hazard and in workmen's compensation benefits for the consequences of the inherent risk of the calling.'"), *quoting Krauth v. Geller*, 157 A.2d 129, 131 (1960). No such rationale exists here, as the state does not compensate the public for the risks inherent in highway travel.

¶17        Rather, the state and the Association ask us to preclude liability based on public policy considerations arising from the unpredictability of wild animals. The evidence presented at trial, however, was that elk predictably cross I-40 near milepost 211. When the policy behind a doctrine is not applicable, the doctrine itself may not be either. Our supreme court refused to apply the *Salladay* doctrine in a case in which the plaintiff had been injured by a cable gate crossing a canal road because the policy considerations behind the doctrine did not apply to the type of accident at issue. *Bledsoe v. Goodfarb*, 170 Ariz. 256, 265, 823 P.2d 1264, 1274 (1991). The court concluded that the doctrine was only "properly applied to claims based on the theory that the operation of an unfenced canal and its equipment is per se an act of negligence." *Id.* It declined to apply the doctrine where there was "evidence the canal operator maintained [a canal] road in a manner that was unreasonably dangerous given [the road's] foreseen and permitted use by the public." *Id.*

¶18        The state also argues that it should be relieved from liability on public policy grounds because of "the tremendous cost and futility of trying to animal-proof our highways."

11

But neither the state's nor the Association's briefs direct us to any facts in the record which establish that such costs are either tremendous or unreasonable. Furthermore, the state does not dispute that it has undertaken substantial measures to prevent collisions with large animals on SR-260 and that such measures can be ninety-six percent effective. Such actions suggest that the state itself has concluded that protecting our citizens from collisions with large animals is neither prohibitively expensive nor futile.

¶19            The Association warns that, by failing to categorically bar claims based on injuries caused by wild animals on Arizona's highways, we expose governmental entities to liability based on every conceivable accident scenario that might be caused by every conceivable wild animal. The Association asserts that, if we affirm the judgment in this case, governmental authorities would be forced to fence every mile of every highway within its jurisdiction. But our approval of the trial court's decision to allow the jury to assess the reasonableness of the state's acts or omissions supports no such far-reaching conclusion.

¶20            Our decision here does not divest trial courts of their gate-keeping function. Not every case involving a collision with a wild animal will necessarily merit presentation to a jury. *See Coburn*, 143 Ariz. at 52-53, 691 P.2d at 1080-81 (finding that municipalities have a duty to keep streets reasonably safe but affirming trial court's legal determination that claimant had not presented adequate facts from which jury could conclude duty had been breached); *Bellezzo*, 174 Ariz. 548, 851 P.2d 847 (acknowledging state's duty to protect against unreasonable risks of harm at baseball stadium but finding as a matter of law that state had conformed to that duty); *Church of Jesus Christ of Latter Day Saints v. Superior Court*, 148 Ariz. 261, 714 P.2d 431 (App. 1985) (acknowledging city's duty to keep streets reasonably safe for travel but reversing trial court's

denial of summary judgment where claimant did not present sufficient facts from which jury could conclude duty had been breached); *White v. Murdock*, 877 P.2d 474, 478 (Mont. 1994) (summary judgment for state affirmed when "no evidence was produced that there was an established or known moose crossing place at or near" accident site, warning signs previously posted in the area "had been repeatedly stolen," and "the slough which had formerly attracted moose to that area was drained"). Thus, nothing in this decision precludes trial courts from granting summary judgment in favor of a governmental defendant when the claimant's injuries have been caused by wild animals under circumstances that would not create an "unreasonable risk of harm." *Bellezzo*, 174 Ariz. at 551, 851 P.2d at 850 (negligence is conduct that exposes others to unreasonable risk of harm); *Markowitz*, 146 Ariz. at 357, 706 P.2d at 369 ("[I]t may be said in some cases as a matter of law that defendant's actions or inactions do not breach the applicable standard of conduct.").

¶21         Our conclusion here does not mean governmental agencies must "animal proof" all highways. Nor does it suggest any particular action must be taken. Rather, we merely conclude that, based on the record in this case, including the uncontested fact that there were recorded 168 elk- or deer-related collisions on this eleven-mile stretch of highway within seven years, the reasonableness of the state's inaction in addressing and seeking to remedy the risk to drivers was a question for the jury. *See Dunham*, 161 Ariz. at 306, 778 P.2d at 1202 (reversing directed verdict in favor of county where evidence showed sixty-five accidents at intersection over the course of several years, fifty-two of which were similar to plaintiff's). In *Dunham*, our supreme court found that strong statistical evidence showing a foreseeable risk to drivers on a particular segment of road created a question of fact for a jury to decide relating to the issue of negligence, even when the risk was created primarily by the unlawful actions of other drivers. As the court

13

noted, when "evidence is offered from which a fact-finder could reasonably conclude that the public agency or jurisdiction should have foreseen a danger to plaintiff . . . then the question of [that public entity's] negligence is one for the jury." *Id.; see also Markowitz*, 146 Ariz. at 358, 706 P.2d at 370; *Bach*, 152 Ariz. at 149-50, 730 P.2d at 858-59.

¶22         Although the Association acknowledges that the state has taken measures to reduce collisions with large animals in some high risk areas, it asserts that "[w]here, when and whether [such measures] should be undertaken is a matter properly left to the legislature, which is uniquely equipped to weigh the cost and efficacy of such measures." However, the Association has not directed us to a particular statute or provided us with any other support for the proposition that the legislature intended to insulate the state from liability for this type of incident. *Cf.* A.R.S. §§ 12-820.01, 12-820.02 (extending absolute or qualified immunity to public entities in certain specified circumstances). We also note that the Association here asks us to address and expand a common law doctrine of immunity, the application and modification of which falls within the prerogative of the judiciary. *See Cronin v. Sheldon*, 195 Ariz. 531, ¶26, 991 P.2d 231, ¶26 (1999). Although we acknowledge that the public interest can sometimes require special rules to protect certain entities from ordinary theories of tort liability, we must also consider that "special rules of nonliability and immunity lead to the encouragement of irresponsibility and consequent harm to society." *Ontiveros v. Borak*, 136 Ariz. 500, 512, 667 P.2d 200, 212 (1983) (despite legislative silence, overruling common-law rule protecting tavern owners from liability for the acts of intoxicated customers), *superseded by* A.R.S. §§ 4-311, 4-312. For this reason, immunity is the exception and not the rule. "'There is perhaps no doctrine more firmly established than the principle that liability follows tortious wrongdoing; that where negligence is the proximate cause

14

of injury, the rule is liability and immunity is the exception.'" *Ryan*, 134 Ariz. at 309, 656 P.2d at 598, *quoting Stone*, 93 Ariz. at 393, 381 P.2d at 112, *modified by statute as stated in Tucson Unified Sch. Dist. v. Owens Corning Fiberglass Corp.*, 174 Ariz. 336, 339, 849 P.2d 790, 793 (1993).

¶23        In the absence of any persuasive public policy reason for immunizing the state from liability for all injuries caused by wild animals, no matter how foreseeable the risk or how feasible the remedy might be, and in the absence of any expression of legislative intent to limit state liability in this arena, we decline to expand the common law as the state and the Association suggest.

¶24        Affirmed.


_____
PETER J. ECKERSTROM, Judge

CONCURRING:


_____
PHILIP G. ESPINOSA, Chief Judge


_____
JOHN PELANDER, Presiding Judge


15