A10A1955. THE LANDINGS ASSOCIATION, INC.
v. WILLIAMS et al.
A10A1956. THE LANDINGS CLUB, INC. v. WILLIAMS et al.
(711 SE2d 294)

ELLINGTON, Chief Judge.
In this action, the estate and heirs of Gwyneth Williams (collectively, "the appellees") seek to recover damages from the owners of a lagoon where Williams was allegedly killed by a large alligator. The State Court of Chatham County denied in part the motion for summary judgment filed by the joint owners of the lagoon, The Landings Association, Inc. ("the association") and The Landings Club, Inc. ("the club").[1] We granted the applications filed by the association and the club (collectively, "the owners") for an interlocutory appeal from that ruling. We have consolidated the association's appeal, Case No. A10A1955, and the club's appeal, Case No. A10A1956, for disposition.

The owners contend that they are entitled to judgment as a matter of law under both premises liability and nuisance theories of recovery. In addition, the owners contend that, under the doctrine of animals ferae naturae, a landowner is not responsible for any harm caused by a free wild animal on the owner's land. For the reasons explained below, we affirm in part and reverse in part.

---

[1] In the same order, the trial court granted summary judgment in favor of the owners as to the appellees' claim under OCGA § 51-2-7, as discussed below.

In order to prevail on a motion for summary judgment under OCGA § 9-11-56,

> the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citations omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

Viewed in the light most favorable to the appellees, the record shows the following. On the morning of October 6, 2007, Williams' body was found floating in a lagoon that lay about 100 yards from the home of Susan and Bill Norton, Williams' daughter and son-in-law, at The Landings, a residential community on Skidaway Island, where Williams, who was 83 years old, had been housesitting. The medical examiner determined that an alligator had bitten off her right foot, her hands and her forearms, causing Williams to bleed to death within minutes.[2] Jack Douglas, an alligator trapper licensed by the Georgia Department of Natural Resources ("DNR"), searched the lagoon and trapped and killed an alligator that was over eight feet long and weighed 130 pounds. Parts of Williams' body were still inside the alligator's stomach.

Williams was last seen alive when she spoke with a neighbor at approximately 6:00 on the night before her body was found in the lagoon. Three teenaged boys heard a woman crying for help as they drove a golf cart on a path along the golf course at approximately 9:00 that night.

The man-made lagoon where Williams' body was found, known as Lagoon 15, was bordered on one side by a park-like common area owned by the association and on the other side by the golf course, which is owned and operated by the club. The association and the club jointly own the lagoon, which is part of an interconnected complex of approximately 150 lagoons on The Landings' 4,500-acre community. The property's previous owner, Union Camp Corpora-

---

[2] The owners dispute that an alligator attack caused Williams' death, citing expert opinion evidence that Williams might have died as a result of a heart attack or drug overdose before the alligator consumed parts of her body.

tion, began building the lagoons in the 1970s for drainage so that the low-lying property could be developed, and The Landings' developer added more lagoons. The association stocks the freshwater lagoons with fish for sport fishing.

The lagoon complex connects to wild marshland on Skidaway Island. Alligators, which are wild and indigenous to coastal Georgia, travel freely on and off the island, between the marsh and The Landings' lagoon system, and between lagoons. The owners were aware that alligators were common in every lagoon and sometimes came onto the banks and golf courses.

Alligators normally feed on small animals, such as fish, snakes, frogs, and turtles, in the water or within a few feet of the water's edge. Alligators ordinarily avoid humans, and attacks on humans are very rare but may occur when alligators lose their fear of people as a result of people throwing food to them, when they are foraging at night, and when they are nesting and protecting their young. Alligators begin nesting when they are about six feet long and reach their sexual maturity. Most attacks on humans that result in a serious injury or fatality are by alligators over eight feet long. Before Williams' death, there had never been an alligator attack on a human at The Landings.

The association has a policy of arranging to have the trapper remove any alligator that is over seven feet long, to prevent them from nesting near residential areas, as well as any alligator that shows aggression toward people or pets. Although the association regularly inspects and maintains the vegetation in The Landings' lagoons (whether owned by the association, the club, or both), it does not patrol or inspect the lagoons for alligators. Instead, the association calls for the trapper to remove an alligator whenever a resident or employee reports seeing a large or aggressive alligator. In the four months preceding Williams' death, the association called for the trapper to remove at least eleven alligators that were over seven feet long, in addition to several others that were nearly that size. Just one month before Williams' death, the trapper removed an alligator that was over ten feet long and weighed nearly 300 pounds.

At least annually, in its resident directory or another publication, the association warns residents that alligators live on the property and that alligators that are fed by people and female alligators that are guarding their young can be extremely dangerous to people and pets. In the same way, the association advises residents of its policy of removing large alligators. Neither the association nor the club posts signs at the lagoons to warn visitors that alligators may be present in or near the lagoons. There is no competent evidence in the record that Williams knew there might be alligators longer than seven feet long at The Landings, or that Williams knew

that there were alligators of any size in Lagoon 15, although there was evidence that on two or possibly three occasions she had seen an alligator near the road.[3]

In their complaint, the appellees claimed that the owners are liable for Williams' pain and suffering and wrongful death under theories of premises liability and nuisance. The appellees alleged that the owners were negligent in several ways, including in knowingly creating and maintaining an ideal habitat for alligators in close proximity to The Landings' residential and recreational areas and, having created such a habitat, in failing to take reasonable steps to protect residents and visitors from alligator attacks. The appellees also asserted a claim under OCGA § 51-2-7, which provides that "[a] person who owns or keeps a vicious or dangerous animal of any kind and who, by careless management or by allowing the animal to go at liberty, causes injury to another person who does not provoke the injury by his own act may be liable in damages to the person so injured." The trial court determined that neither the club nor the association was the owner or keeper of the alligator as a matter of law and, therefore, granted summary judgment in favor of the owners as to the appellees' claim under OCGA § 51-2-7.[4] The trial court denied the motions for summary judgment filed by the owners on the appellees' remaining claims.

1. The owners contend that, because alligator attacks on humans are rare and because there had been no prior alligator attacks on any human at The Landings, there is no evidence from which a jury could find that the alleged attack on Williams was foreseeable. In the alternative, the owners contend that, to the extent that they could have reasonably anticipated the attack because they knew alligators were in The Landings' lagoons, their knowledge of the risk was not superior to that of Williams, who also knew that there were alligators in the lagoons. In addition, the owners contend that, because there is no evidence regarding how long the particular alligator that attacked Williams had been in Lagoon 15, there is no evidence from which the jury could find that they could have prevented the attack by

---

[3] Specifically, Bill Norton testified that he knew that Williams had seen an alligator at The Landings "once or twice" from the car, when they passed an alligator sitting on the side of the road. Based on these sightings, he opined that Williams knew there were alligators in the lagoons at The Landings, but he never discussed alligators with her. Bill Norton was not asked to estimate the length of the alligator (or alligators) that he and Williams had seen. He testified, however, that he believed that he had never seen an alligator more than seven feet long at The Landings, although, he stated, "it's hard to tell the size from a distance." In addition, Williams' son, Russell Williams, testified that, while he and Williams were driving at The Landings, they had seen one alligator on the side of the road. Russell Williams was not asked to estimate the length of that alligator.

[4] The appellees did not appeal from that ruling.

inspecting the lagoons and removing large alligators.

Under Georgia law, an owner or occupier of land is liable to its invitees "for injuries caused by [its] failure to exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1.[5] An owner's obligation to keep the premises safe "includes a duty to inspect the premises to discover possible dangerous conditions of which [it] does not know and to take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement and use of the premises." (Citation and punctuation omitted.) *Thomas v. Home Depot U.S.A.*, 284 Ga. App. 699, 700 (644 SE2d 538) (2007). Still, the owner's duty to exercise ordinary care "is not a duty to absolutely prevent injury as a proprietor is not an ensurer of the safety of its customers." (Citation omitted.) Id. "The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property." (Citation and punctuation omitted.) Id. Generally, when an invitee learns, or in the exercise of ordinary care the invitee should have learned, of a hazard on the premises and thus, by the exercise of ordinary care for his or her personal safety, can avoid being injured, the owner is not liable if the invitee fails to exercise such care and is injured. *Robinson v. Kroger Co.*, 268 Ga. 735, 736 (1) (493 SE2d 403) (1997).

Further, the owner's statutory duty to keep the premises safe is not limited to physical defects in the owner's property; it extends to "risks upon the premises in the nature of vicious animals or ill-tempered individuals likely to inflict harm upon invitees visiting upon the premises." (Citation and punctuation omitted.) *Beard v. Fender*, 179 Ga. App. 465 (346 SE2d 901) (1986).[6] It is axiomatic that,

> as a general proposition[,] issues of negligence, contributory negligence and lack of ordinary care for one's own safety are not susceptible of summary adjudication but should be resolved by trial in the ordinary manner. . . . Where reasonable minds can differ as to the conclusion to be reached with regard to questions of whether an owner/occupier breached the duty of care to invitees and whether an invitee exercised reasonable care for personal safety, summary adjudication is not appropriate.

---

[5] For purposes of this argument, the owners do not contest Williams' status as an invitee.

[6] See generally Charles R. Adams, Georgia Law of Torts, § 4-5 (2010-2011 ed.); Restatement (Second) Torts, § 344 (1965, updated August 2010) (A possessor of land may be liable to visitors for its failure to exercise reasonable care to discover that animals are doing or are likely to do acts that are harmful to visitors or to give a warning adequate to enable the visitors to avoid the harm or otherwise to protect them against it.); see also Division 2, infra.

(Citations and punctuation omitted.) *Robinson v. Kroger Co.*, 268 Ga. at 739-740 (1). Thus, issues about how closely an owner or occupier of land should monitor its premises and approaches, whether particular hazards are foreseeable, and how vigilant invitees must be for their own safety in various settings "are all questions that, in general, must be answered by juries as a matter of fact rather than by judges as a matter of law." *American Multi-Cinema v. Brown*, 285 Ga. 442, 445 (2) (679 SE2d 25) (2009). "The trial court can conclude as a matter of law that the facts do or do not show negligence on the part of the defendant or the plaintiff only where the evidence is plain, palpable and undisputable." (Citations and punctuation omitted.) *Robinson v. Kroger Co.*, 268 Ga. at 739 (1).

In this case, there is some evidence that alligators pose a risk of harm to humans under certain circumstances, as noted above. Further, although there had been no reported alligator attack on a person at The Landings, there is evidence that the owners were aware of that risk.[7] We conclude that the owners in this case failed to show that an alligator attack upon a person was a danger arising from the arrangement and use of their premises which was not foreseeable as a matter of law, such that the owners had no duty to take reasonable precautions to protect invitees from the danger. In addition, we conclude that the owners failed to show that, as a matter of law, Williams equally understood the dangers she might encounter walking near the lagoon and that she nonetheless failed to exercise ordinary care for her own safety.[8] Given the disputed evidence, we conclude that reasonable minds could reach different conclusions regarding the essential elements of the appellees' premises liability claims.[9] Consequently, as the trial court correctly concluded, summary adjudication is not appropriate on these issues.[10]

---

[7] See *Piggly Wiggly Southern v. Snowden*, 219 Ga. App. 148, 149 (1) (b) (464 SE2d 220) (1995) (Although a plaintiff may show that an owner knew that conditions on the owner's property subjected invitees to an unreasonable risk of criminal attack by showing that the owner knew of prior substantially similar criminal activity on the owner's property, a plaintiff may establish foreseeability in other ways.).

[8] In particular, we note the logical inconsistency between the club's contention that it is undisputed that *Williams* appreciated the danger presented by the alligators in the owners' lagoons, citing only to evidence that Williams had seen one or two small alligators near the roads at The Landings, and the club's claim that *it* lacked any knowledge of the danger presented by the alligators in its lagoons, even though it had been dealing with alligators on its golf courses and in its lagoons for over 35 years.

[9] We note that the dissent agrees that a jury could conclude that the danger of an alligator attack on a person was reasonably foreseeable to the owners. In going on to find that, as a matter of law, the precautions taken by the owners to protect their invitees from that danger were reasonable under the circumstances, the dissent, in our view, usurps the role of the jury.

[10] See *American Multi-Cinema v. Brown*, 285 Ga. at 446 (3) (Where there was evidence that collapsible "Wet Floor" signs tend to fall on contact with moving crowds, that a theater

2. The owners contend that the alligators on their property were indigenous wild animals and, therefore, that, under the doctrine of animals ferae naturae, the owners had no duty to protect Williams from harm from an alligator. Consequently, the owners contend, the trial court erred in denying their motions for summary judgment on all of the appellees' claims.

An animal ferae naturae is a wild animal, that is, one that is not classed as "domesticated." Black's Law Dictionary (9th ed. 2009); *Candler v. Smith*, 50 Ga. App. 667 (179 SE 395) (1935). So long as the owner or possessor of land does not own or keep an indigenous wild animal, as in this case, "the law does not require the owner or possessor of land to anticipate the presence of[,] or guard an invitee against harm from[,] animals ferae naturae." (Citation and punctuation omitted.) *Williams v. Gibbs*, 123 Ga. App. 677, 678 (182 SE2d 164) (1971) (physical precedent only).[11] In that case, a service station

owner's agents set up such a sign in an area just before a large concentration of patrons would cross that area to exit, and that a patron did not see the collapsed sign on the floor until it was too late to avoid tripping over it, the owner was not entitled to summary judgment on the patron's premises liability claim.); *Augusta Country Club v. Blake*, 280 Ga. App. 650, 655-656 (1) (634 SE2d 812) (2006) (Where there was evidence that the club owner knew that magnolia trees on its property constantly dropped seed pods and other debris onto walkways, that the walkways were not inspected and cleaned the morning a visitor slipped on a seed pod that was on a step and fell, and that the visitor did not see the seed pod before falling, the owner was not entitled to a directed verdict on the visitor's premises liability claim.); *Sutton v. Winn Dixie Stores*, 233 Ga. App. 424, 428 (504 SE2d 245) (1998) (Where there was evidence that a store owner had actual knowledge that several hours of hard rain had caused rain water to accumulate near the entrance, that the owner voluntarily undertook to place a warning sign and floor mat at the entrance and to have an employee mop every five minutes, that an employee failed to mop the floor as directed, and that a customer did not see the puddled water or the warning sign before she slipped and fell, the owner was not entitled to summary judgment on the customer's premises liability claim.); *Piggly Wiggly Southern v. Snowden*, 219 Ga. App. at 149-150 (1), (2) (Where there was evidence that, before a customer was abducted from a store parking lot and violently attacked, the store owner knew of many previous incidents of customers having purses snatched and of the frequent presence of menacing loiterers near the store entrance, that many of the store's employees considered the parking lot to be unsafe, and that the customer did not know of the prior crimes in the parking lot, the owner was not entitled to a directed verdict on the customer's premises liability claim.).

[11] On the other hand, one who owns or keeps a wild animal which is by its inherent nature "a fierce and dangerous beast" is presumed to know of the animal's ferocious habits and nature and is subject to liability for any injury sustained by others through any vicious acts that the animal is naturally inclined to commit. *Candler v. Smith*, 50 Ga. App. at 670-672 (2); see also OCGA § 51-2-7 (liability of an owner or keeper of "a vicious or dangerous animal of any kind[,]" that is, wild or domesticated). As we noted above, in granting the owners' motions for summary judgment on the appellees' claim under OCGA § 51-2-7, the trial court concluded that there was no evidence that the owners owned or kept any alligators on their property, including the one that killed Williams. See also OCGA §§ 27-1-3 (b) (The State of Georgia owns all wildlife in this state.); 27-2-10 (Possessing and propagating alligators is regulated by the State.). The appellees did not appeal this ruling. In addition, we note that, although the owners created and maintained lagoons that were hospitable to alligators and stocked the lagoons with fish, there is no evidence that they took these or any other actions to exert an owner-like control over the alligators or even for the intended purpose of providing a habitat for alligators. See *Glave v. Michigan Terminix Co.*, 407 NW2d 36, 37 (Mich. App. 1987) (Under the doctrine

patron was injured when she encountered a poisonous snake on a sidewalk leading to the service station's restroom. Id. at 677. The patron claimed that the proprietor breached a duty to keep the grass mowed short around the building in order to prevent snakes from coming upon the sidewalk. Id. We held that the owner's failure to keep the grass near the sidewalk mowed short "could only be negligence if the [owner] should have foreseen that there were snakes or other hazards in the area which would be encouraged by the grass and which would constitute a menace to persons using the sidewalk." Id. at 678. If, on the other hand, the owner, "in the exercise of ordinary care, could not have discovered the condition that proximately caused the [patron's] injury, it breached no duty of care owed to the [patron]." (Citation and punctuation omitted.) Id. The owner testified that no one had seen a snake on the premises during the six years he had owned the property, and there was no evidence to the contrary. Id. The undisputed evidence established as a matter of law, therefore, that the presence of a snake on the sidewalk was not reasonably foreseeable. Id. In the absence of knowledge of such a danger, we held, there was no duty on the part of the owner to keep the grass mowed short in order to protect visitors against that hazard and, therefore, the owner was not liable for the patron's injuries. Id.

We do not view the common law doctrine of animals ferae naturae, therefore, as requiring a departure from Georgia's general principles regarding a landowner's duty to exercise ordinary care in keeping its premises safe.[12] To the extent the owners would have us carve out an exception under the doctrine of animals ferae naturae and find that an owner or occupier of land enjoys a blanket immunity from liability for any harm caused by a free wild animal on the owner's land, we decline to do so.[13] Although a defendant may be

of animals ferae naturae, where the defendants never tamed, confined or otherwise controlled the animals, but in fact encouraged their departure, the defendants were not the keepers of the animals.); *Swain v. Tillett*, 152 SE2d 297, 301-302 (N.C. 1967) (Under the doctrine of animals ferae naturae, a person is a keeper of an animal where the person "undertakes to manage, control, or care for the animal as owners in general are accustomed to do[,]" by tending, feeding, pasturing, boarding, and otherwise "supply[ing the animal] with necessaries of life.").

[12] See also *Booth v. State*, 83 P3d 61, 65 (Ariz. App. 2004) (The doctrine of animals ferae naturae does not bar negligence claims based on injuries caused by wild animals or otherwise alter the traditional analysis of a negligence claim for such injuries which remains focused on the issue of whether the defendant could reasonably have foreseen an injury and protected against it.); *Carlson v. State*, 598 P2d 969, 974 (Alaska 1979) (The few cases that have been published on the issue of liability for damage caused by a wild animal when the animal is not under the control of the defendant "appear to agree, that, if a landowner knows that a wild animal is creating a dangerous situation on his property, he has a duty either to remove the danger or to warn the people who may be threatened by the danger.").

[13] Cf. *Belhumeur v. Zilm*, 949 A2d 162, 166 (N.H. 2008) (Because requiring that a landowner "abate all harm potentially posed to his neighbors by indigenous animals, plants or

entitled to summary judgment where, as in *Williams v. Gibbs*, there is no evidence that the owners should have anticipated the presence of the wild animal that injured the plaintiff, there is no issue in this case regarding whether the owners should have *anticipated* the presence of alligators in their lagoons. Rather, the evidence is undisputed that the owners had *actual knowledge* that alligators were commonly present throughout the lagoon system. Because the undisputed evidence does not establish as a matter of law that the owners could not reasonably foresee that their lagoons would encourage alligators that would constitute a menace to people using the adjacent common areas and golf courses, see Division 1, supra, the owners are not entitled to judgment as a matter of law under the doctrine of animals ferae naturae.

3. The association contends that there is no evidence from which a jury could find that it maintained a nuisance and, therefore, it is entitled to judgment as a matter of law on the appellees' nuisance claim.

"There is general agreement that nuisance is incapable of any exact or comprehensive definition." (Citation and punctuation omitted.) *Fielder v. Rice Constr. Co.*, 239 Ga. App. 362, 365 (1) (522 SE2d 13) (1999).[14] Although the Georgia Nuisances Code defines a nuisance very broadly as "anything that causes hurt, inconvenience, or damage to another[,]"[15] nuisance law is grounded in the fundamental premise that everyone has the right to use his or her property as he or she sees fit, provided that in so doing the owner or occupier does not unreasonably invade the corresponding right of others to use their own property as they see fit. *Wilson v. Evans Hotel Co.*, 188 Ga. 498, 501 (1) (4 SE2d 155) (1939); *Holman v. Athens Empire Laundry Co.*, 149 Ga. 345 (100 SE 207) (1919).[16] Thus, a private nuisance may

insects naturally located upon his property would impose an enormous and unwarranted burden[,]" a landowner "cannot be liable to their neighbors in negligence for the independent acts of wild animals that are not possessed or harbored by the [landowner]," and, therefore, the defendants were entitled to summary judgment on a neighbor's nuisance claim that was based on the landowners' negligently allowing wild bees to nest in a tree on their property.); *Nicholson v. Smith*, 986 SW2d 54, 63-64 (II) (Tex. App. 1999) (Requiring that a landowner affirmatively warn guests "about the presence and behavior patterns of every species of indigenous wild animals and plants which pose a potential threat to a person's safety, as well as the extent of that threat[,]" would impose an "enormous" burden on the landowner and "would border on establishing an absolute liability.") (dicta).

[14] See also *City of Bowman v. Gunnells*, 243 Ga. 809, 810-811 (2) (256 SE2d 782) (1979) ("Neither this court, nor any other court to our knowledge, has been able to give a precise legal definition of nuisance that would apply to all situations. It has been said that pornography cannot be defined but you know it when you see it. A nuisance is in a similar category.").

[15] OCGA § 41-1-1.

[16] A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land. . . . [I]nterests in the use and enjoyment of land . . . [are] the interests that are protected by actions for private nuisance. When

exist when an owner or occupier's activity on its real property generates an unreasonable amount or type of smoke,[17] noxious odors,[18] water,[19] noise,[20] or something else that invades the real property of another, causing damage to the property, injury to a person on the property, or other harm.

In their complaint, the appellees claim that Williams was fatally injured *on the owners' property*; they do not allege that anything generated by the owners' activities on their property invaded *the appellees' property* and thereby infringed on their right of peaceful enjoyment. Accordingly, the association is entitled to judgment as a matter of law on the appellees' nuisance claim, and the trial court erred in ruling otherwise. *Cox v. De Jarnette*, 104 Ga. App. 664, 675-676 (2) (a) (123 SE2d 16) (1961) (Because the plaintiff's purported claim for private nuisance, which was based on her slipping and falling on the defendant's premises, involved no invasion of an interest in the use and enjoyment of the plaintiff's land, the complaint failed to state a claim for nuisance.); see also *Johnson v. Ga. Kraft Co.*, 167 Ga. App. 585, 585-586 (1) (307 SE2d 103) (1983) (physical precedent only) (accord).

4. The club contends that, because the appellees filed transcripts of the depositions of Joseph Maffo, Joel O'Quinn, and Dale Dudley after the hearing on the owners' motions for summary judgment and without leave of court or the owners' consent, the trial court erred in considering that testimony. We have concluded, even without considering the testimony of these experts, that the owners are not entitled to judgment as a matter of law on their potential liability under OCGA § 51-3-1. See Divisions 1 and 2, supra. Accordingly, the issue of whether the trial court abused its discretion in considering the challenged testimony is moot.

*Judgment affirmed in part and reversed in part. Barnes, P. J., Miller, P. J., Phipps, P. J., and McFadden, J., concur. Andrews and Doyle, JJ., concur in part and dissent in part.*

ANDREWS, Judge, concurring in part and dissenting in part.

Although no one saw what happened, there is evidence that an eight-foot-long wild alligator present in a lagoon at The Landings

---

there is an invasion of these interests, the [appellee] may recover not only for harm arising from acts that affect the land itself and the comfortable enjoyment of it, but also for harm to members of his family and to his chattels.

Restatement (Second) of Torts, § 821D (1979, current through April 2010).

[17] *Holman v. Athens Empire Laundry Co.*, 149 Ga. at 345 (6).
[18] *Poultryland, Inc. v. Anderson*, 200 Ga. 549, 558 (1) (37 SE2d 785) (1946).
[19] *Dyches Constr. Co. v. Strauss*, 192 Ga. App. 454, 456 (1) (385 SE2d 316) (1989).
[20] *Wilson v. Evans Hotel Co.*, 188 Ga. at 501 (1).

residential community attacked and killed Gwyneth Williams as she walked alone at night near the lagoon. Ms. Williams's heirs and estate sued the owners of the lagoon and abutting areas, The Landings Association, Inc. and The Landings Club, Inc., to recover wrongful death and other damages under various theories of liability. I fully concur in Division 3 of the majority opinion finding that the owners are entitled to summary judgment on the claim that they are liable for maintaining a nuisance. I respectfully dissent because I conclude that the owners are also entitled to summary judgment on the claim under OCGA § 51-3-1 that they are liable for negligently failing to exercise ordinary care to protect Ms. Williams from the alleged attack.[21]

At the time of the alleged attack, Ms. Williams was visiting at the house owned by her daughter and son-in-law at The Landings, a gated residential community of about 8,500 residents located on 4,500 acres on Skidaway Island, a coastal barrier island near Savannah. The land on which The Landings was developed included natural lagoons and swamps with fresh and brackish water and was bordered by saltwater marshes, all of which was prime habitat for alligators indigenous to the area. Wild alligators have lived on the land now occupied by The Landings before The Landings was developed, during the time The Landings was developed in the 1970s, and to this day. To develop The Landings, swampy areas were drained and then shaped by the developers into a system of about 150 lagoons, including the lagoon where Ms. Williams was allegedly attacked by the alligator. The lagoons serve the necessary function of providing storm water management and drainage for The Landings and preventing those areas from reverting back to swamp. Before the lagoon system was built, alligators lived in or near the swampy areas and moved from these areas to nesting areas in nearby marshes. After the lagoons were built, alligators continued to live in the lagoons where the swamps were before, and moved across The Landings from lagoon to lagoon and to nearby marshes.

This history makes clear that alligators have existed at the site of The Landings before and since it was developed because they are

---

[21] There is evidence showing that the alleged attack occurred in or near lagoon number 15. The Landings Association and The Landings Club each own a portion of lagoon 15. The Landings Association is the homeowners association at The Landings and owns common areas, including a common area bordering lagoon 15 and the portion of the lagoon abutting that area. The Landings Club owns golf and other recreational facilities at The Landings, including a golf course bordering lagoon 15 and the portion of the lagoon abutting the course. The Landings Association maintained all of lagoon 15 under a contract with The Landings Club. As set forth in the majority opinion, for the purpose of these appeals, The Landings Association and The Landings Club are sometimes jointly referred to as the owners, and it is assumed, without deciding, that Ms. Williams was an invitee of the owners at the time of the alleged attack.

indigenous "wildlife," as defined in OCGA § 27-1-2 (77). As set forth in OCGA § 27-1-3 (b), these alligators are wildlife and are not owned or controlled by The Landings Association, The Landings Club, or any other private entity.

> The ownership of, jurisdiction over, and control of all wildlife, as defined in this title, are declared to be in the State of Georgia, in its sovereign capacity, to be controlled, regulated, and disposed of in accordance with this title. Wildlife is held in trust by the state for the benefit of its citizens and shall not be reduced to private ownership except as specifically provided for in this title. All wildlife of the State of Georgia is declared to be within the custody of the [Georgia Department of Natural Resources] for purposes of management and regulation in accordance with this title. However, the State of Georgia, the department, and the board shall be immune from suit and shall not be liable for any damage to life, person, or property caused directly or indirectly by any wildlife.

OCGA § 27-1-3 (b). Pursuant to OCGA § 27-1-22, only the Georgia Department of Natural Resources (DNR), and persons authorized by contract with the DNR, have the authority to take, capture, or transport the indigenous wild alligators at The Landings.

Despite the presence of a wild alligator population living and moving about in The Landings since it was developed in the 1970s, there had never been an alligator attack on a person at The Landings until the alleged attack on Ms. Williams in October 2007. No warnings about alligators were posted on-site at the lagoons or elsewhere in The Landings property, but The Landings Association warned residents in printed publications and on-line that wild alligators at The Landings could be dangerous. Neither The Landings Association nor The Landings Club attempted to capture, remove, or otherwise control or restrict the movement of wild alligators owned by the State and under the custody and management of the DNR. The Landings Association policy was to ask the DNR to remove alligators over seven feet long or any aggressive alligators on the basis that larger or aggressive alligators could pose a danger. No effort was made by The Landings Association or The Landings Club to inspect the lagoons or other areas to look for large or aggressive alligators — the policy was to ask the DNR to remove these alligators as they were seen and reported. By permit, the DNR authorized a trapper to remove the alligators. The policy was also that residents could call DNR directly to report an alligator they thought should be removed, or they could report an alligator to The

Landings Association, which would confirm the location of the alligator and then call the DNR to ask for removal. Under this policy, numerous alligators have been removed from The Landings by the DNR-authorized trapper.

Since May 2000, Ms. Williams's daughter and son-in-law owned a house at The Landings where Ms. Williams had visited over the years on many occasions, sometimes staying for two or three months at a time. Ms. Williams was housesitting while her daughter and son-in-law were away when the alleged alligator attack occurred in October 2007. Behind the house, a park-like common area bordered lagoon 15 on one side and a golf course bordered it on the other side. The lagoon itself was about 300 feet behind the house. There is evidence to support the contention that Ms. Williams was walking alone somewhere in these areas near the lagoon around 9:00 on an October night when she was attacked by the alligator. Ms. Williams's daughter and son-in-law testified that they were aware of alligators at The Landings and in lagoon 15. Ms. Williams's son-in-law remembered Ms. Williams being with him on one or two occasions at The Landings when they saw an alligator while riding in his car and he stopped the car so she could look at the alligator. As to Ms. Williams's knowledge and appreciation of the danger posed by alligators at The Landings, her son-in-law testified:

> Q: And to your knowledge then Ms. Williams was aware that there were alligators in the lagoons at The Landings?
> A: Yes.
> Q: Did she ever comment to you about — for instance, I have a fear of snakes. Did she have any fear of alligators or anything like that that you knew of?
> A: Not specifically, I mean, other than, you know, the normal one in respecting wild animals.
> Q: All right. Did you ever have any discussion with her or any comments about how one should be around alligators, for instance don't feed the alligators, don't get too close, anything like this?
> A: No. There was never — quite frankly, there was never any reason to. I mean she was an intelligent person. She would — there was no question in my mind that — I guess I have to answer that as it's not like talking to a five year old child . . . stay away from alligators.

Similarly, Ms. Williams's son testified that, while visiting with his sister at The Landings, he recalled driving at The Landings with his mother when they saw an alligator. He testified: "[W]e did see one on the side of the road. And I do recall my mother saying that, you know,

something to the effect that she did not like alligators, she would not want to go anywhere near them." Ms. Williams knew that the lagoon with alligators was located behind the house where she was staying.

These facts require application of premises liability law in conjunction with the doctrine of "animals ferae naturae" relating to a land owner's duty to protect an invitee from an attack by an indigenous wild animal on the premises. Under OCGA § 51-3-1, a premises owner has a duty to exercise ordinary care to protect invitees from unreasonable risks of harm on the premises of which the owner has superior knowledge. *Robinson v. Kroger Co.*, 268 Ga. 735, 740 (493 SE2d 403) (1997). This duty does not require a premises owner to ensure the safety of invitees, but to take "reasonable precautions to protect invitees from dangers foreseeable from the arrangement or use of the premises." Id. The doctrine of "animals ferae naturae," meaning animals of a wild nature, recognizes that the state rather than the premises owner owns and controls indigenous wild animals on the premises, and provides in general that "a landowner cannot be held liable for the acts of animals ferae naturae, that is, indigenous wild animals, occurring on his or her property unless the landowner has actually reduced the wild animals to possession or control, or introduced a non-indigenous animal into the area." *Nicholson v. Smith*, 986 SW2d 54, 60 (Tex. App. 1999). "Generally, the law does not require the owner or possessor of land to anticipate (the) presence of or guard (an) invitee against harm from animals ferae naturae. 3 CJS Supp., Animals, § 143, citing *Gowen v. Willenborg*, 366 SW2d 695 (Tex. Civ. App. [1963])." *Williams v. Gibbs*, 123 Ga. App. 677, 678 (182 SE2d 164) (1971) (no duty to protect against indigenous wild rattlesnake where none had previously been seen on the premises). The basis for application of the doctrine in premises liability cases sounding in negligence is that, because wild animals are generally not predictable or controllable, a premises owner generally has no duty to protect an invitee from a wild animal attack that was not reasonably foreseeable or that could not have been prevented by taking reasonable precautions. *Booth v. State*, 83 P3d 61, 65 (Ariz. App. 2004).

No alligator had ever attacked a person at The Landings prior to the alleged attack on Ms. Williams. Even so, the numbers of alligators and proximity to people at The Landings; the warnings provided to residents regarding alligators; the policy of requesting that the DNR remove large or aggressive alligators; and the numbers of alligators removed by the DNR pursuant to the policy, provides evidence from which a jury could conclude that the danger of an alligator attack on a person, though minimal, was reasonably foreseeable to the owners. Assuming the danger was foreseeable, the issue is whether the owners violated a duty to exercise ordinary care

to protect Ms. Williams from the alleged alligator attack.

> Exactly what constitutes "ordinary care" varies with the circumstances and the magnitude of the danger to be guarded against. Since it is impossible to prescribe definite rules in advance for every combination of circumstances which may arise, the details of the standard must be filled in each particular case. But, to be negligent, the conduct must be unreasonable in light of the recognizable risk of harm. The particular standard of care to be applied and whether the owner breached that standard are usually issues to be decided by a jury. However, these issues may be decided by the court in plain and palpable cases where reasonable minds cannot differ as to the conclusion to be reached.

(Citations and punctuation omitted.) *Lau's Corp. v. Haskins*, 261 Ga. 491, 493 (405 SE2d 474) (1991). The doctrine of animals ferae naturae informs this issue by recognizing that the nature of the risk posed by indigenous wild alligators is often unpredictable and uncontrollable. The presence of indigenous wild alligators in the midst of The Landings obviously posed a generalized risk of an alligator attack on a person, but the magnitude of the risk was minimal given that no attack had ever occurred in the history of The Landings from its development in the 1970s until the alleged attack on Ms. Williams in 2007. There is no evidence that the lagoons created a dangerous condition which caused alligators to act in unexpected or abnormal ways or caused alligators to be where they were not normally found. See *Nicholson*, 986 SW2d at 62-63; compare *Carlson v. State*, 598 P2d 969 (Alaska 1979) (factual issue where wild bear attack occurred at location where bears were attracted by uncollected garbage). To the contrary, the lagoons at The Landings were created and maintained to provide necessary drainage and were shaped from pre-existing swampy areas in prime alligator habitat. Pursuant to OCGA § 27-1-3 (b), ownership, management, and control of the indigenous wild alligators was in the State with custody delegated to the DNR. In apparent consideration of the difficulty of exercising these duties, the State and the DNR were granted statutory immunity in OCGA § 27-1-3 (b) against any liability "for any damage to life, person, or property caused directly or indirectly by any wildlife." Conversely, the owners had no right to control, manage, or remove the alligators at The Landings. The lack of control by the owners, along with the fact that the alligator population was constantly moving in and out of the lagoons and in and out of The Landings into adjacent marshes, makes it unreasonable to find that ordinary care imposed a duty on the owners to

continuously patrol The Landings to look for and remove all large or potentially dangerous alligators in the shifting population. There is no evidence that the owners had prior knowledge of the existence or location of the eight-foot-long wild alligator which allegedly attacked Ms. Williams, and ordinary care did not require them to find and remove the alligator prior to the attack. It is also not reasonable, and possibly at odds with DNR custody and management of wildlife, to find that the duty of ordinary care required the owners to fence or barricade the alligators into the lagoons, or to otherwise fence off The Landings from the alligators. To find that the duty of care required the owners to undertake these or similar measures to attempt to eliminate or reduce the risk of a wild alligator attack is tantamount to imposing a duty to exercise extraordinary care and making the owners ensurers of invitees' safety.[22] The duty imposed on owners under OCGA § 51-3-1 is to exercise ordinary care, not extraordinary care, and it does not require owners to ensure the safety of invitees.

The facts in this case make clear and palpable that the precautions taken by the owners to guard against the minimal risk of an alligator attack were reasonable in light of the nature of the risk — the owners warned residents of the presence of wild alligators at The Landings and pursued a policy of requesting the DNR, which had custody of and managed the alligators, to remove large or aggressive alligators as they were seen and reported. Even though Ms. Williams was not a resident and there is no evidence that she received the warnings about alligators given to residents of The Landings, she was aware of the risk. Ms. Williams visited frequently at The Landings staying for months at a time, and she was well aware of the presence of wild alligators at The Landings and in the lagoons, specifically knew that alligators were in the lagoon where she was walking on the night of the alleged attack, and appreciated the fact that wild alligators are dangerous. Although many circumstances may require an owner to warn an invitee of a latent risk, there is no requirement to warn about an obvious risk which the invitee knows about. *Lau's Corp.*, 261 Ga. at 493. Because I find as a matter of law that the owners exercised ordinary care to keep Ms. Williams reasonably safe from the risk of a wild alligator attack, they were entitled to summary judgment.

Finally, even assuming the owners could be found negligent for failing to exercise ordinary care to protect Ms. Williams from the

---

[22] As members of The Landings Association, the resident homeowners at The Landings could, of course, conclude that extraordinary measures to reduce the risk of an alligator attack are worth undertaking.

alleged alligator attack, I conclude that her knowledge of the risk precluded recovery and entitled the owners to summary judgment. Because the fundamental basis for imposing liability on an owner under OCGA § 51-3-1 is the owner's superior knowledge of the risk, no liability can be imposed where the invitee had equal knowledge of the risk and could have avoided the consequences of the defendant's negligence with the exercise of ordinary care. *Davis v. Crum*, 263 Ga. App. 682, 684 (588 SE2d 849) (2003). When Ms. Williams walked alone at night near the lagoon she was aware of the risk that she could encounter a dangerous wild alligator, regardless of whether she could anticipate the exact size of the alligator.[23] "[A]lthough the issue of a plaintiff's exercise of due diligence for his own safety is ordinarily a question for the jury, it may be summarily adjudicated where the plaintiff's knowledge of the risk is clear and palpable." (Citation and punctuation omitted.) Id. at 685. Ms. Williams had equal knowledge of the presence of wild alligators at The Landings and in the lagoons and knew that wild alligators are dangerous. By walking alone at night near the lagoon, she either assumed the risk of encountering a dangerous wild alligator in the dark or failed to exercise ordinary care to avoid it. *Clark v. Carla Gay Dress Co.*, 178 Ga. App. 157, 159 (342 SE2d 468) (1986).

I am authorized to state that Judge Doyle joins in this opinion.

DECIDED MARCH 25, 2011 —
RECONSIDERATION DENIED APRIL 14, 2011 —

*Barrow & Ballew, Walter W. Ballew III, Travis D. Windsor*, for The Landings Association, Inc.

*Savage & Turner, Robert B. Turner, C. Dorian Britt, David M. Conner, Daniel B. Snipes*, for Williams et al.

*Forbes, Foster & Pool, Morton G. Forbes, Johnny A. Foster*, for The Landings Club, Inc.

---

[23] I find no evidence to support the claim that Ms. Williams saw only "small" alligators at The Landings. The record does not show the size of the alligator or alligators she saw while riding in a car with her son or son-in-law. Ms. Williams's son-in-law, who was riding with Ms. Williams on one occasion when they saw an alligator, testified only that he did not believe he had seen any alligators at The Landings over seven feet long, but he conceded "it's hard to tell the size from a distance."